Brian David Steffy, appellant, v.
Randi Jo Steffy, now known as
Randi Jo Stenson, appellee.

___ N.W.2d ___

Filed May 14, 2013.    No. A-12-082.

1. **Appeal and Error.** An appellate court may, at its option, notice plain error.
2. **Child Custody: Visitation: Appeal and Error.** Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.
3. **Judges: Words and Phrases.** A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result.
4. **Rules of the Supreme Court: Appeal and Error.** Parties who wish to secure appellate review of their claims for relief must be aware of, and abide by, the rules of the Nebraska Supreme Court and the Nebraska Court of Appeals in presenting such claims.
5. ____: ____. Any party who fails to properly identify and present its claim in accordance with the Supreme Court rules does so at its peril and risks the appellate court's declining to address the claim.
6. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.
7. **Rules of the Supreme Court: Appeal and Error.** Assignments of error consisting of headings or subparts of argument do not comply with the mandate of Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2008).
8. ____: ____. In situations where assignments of error do not comply with the mandate of Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2008), the court may consider the case as one in which no brief was filed, or, alternatively, the court may examine the proceedings for plain error.
9. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.
10. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.
11. ____. The threshold question in removal cases is whether the parent wishing to remove the child from the state has a legitimate reason for leaving.
12. ____. Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state.
13. ____. Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state when there is a reasonable expectation of improvement in the career or occupation of the custodial parent.

14. ____. After clearing the threshold of showing a legitimate reason for leaving the state, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

15. ____. In considering a motion to remove a minor child to another jurisdiction, whether the proposed move is in the best interests of the child is the paramount consideration.

16. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in a child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

17. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.

18. ____. The second factor that must be considered regarding a motion to remove a child to another jurisdiction is the potential that the move holds for enhancing the quality of life for the child and the custodial parent. This factor requires an analysis of other considerations which bear upon the potential enhancement of the child's quality of life.

19. ____. In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court evaluates the following considerations: the emotional, physical, and developmental needs of the child; the child's opinion or preference as to where to live; the extent to which the relocating parent's income or employment will be enhanced; the degree to which housing or living conditions would be improved; the existence of educational advantages; the quality of the relationship between the child and each parent; the strength of the child's ties to the present community and extended family there; and the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted.

20. **Courts: Appeal and Error.** An appellate court will not consider an issue that was not passed upon by the trial court.

21. **Constitutional Law: Appeal and Error.** A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal.

Appeal from the District Court for Cass County: RANDALL L. REHMEIER, Judge. Affirmed in part, and in part reversed.

Karen S. Nelson and Liam K. Meehan, of Schirber & Wagner, L.L.P., for appellant.

Steven M. Delaney and Darin L. Whitmer, of Reagan, Melton & Delaney, L.L.P., for appellee.

Irwin, Pirtle, and Riedmann, Judges.

Pirtle, Judge.

## I. INTRODUCTION

Brian David Steffy appeals a decision reached by the district court for Cass County following Brian's attempt to modify the parties' previous divorce decree. In Brian's complaint, he alleged that a material change of circumstances had occurred and sought an increase in child support, and he also sought the court's permission to move with the parties' minor child from Nebraska to Texas. The district court found a material change of circumstances had occurred due to a change in the income of Randi Jo Steffy, now known as Randi Jo Stenson, and the court increased the child support order accordingly. In addition, the court concluded that Brian had failed to prove a legitimate reason for leaving the state, and it thus denied his request for permission to move to Texas. For the reasons that follow, we affirm in part and in part reverse.

## II. BACKGROUND

Brian and Randi moved to Plattsmouth, Nebraska, with their son, Jakob Steffy, in 2003. Jakob, born in August 2001, had been diagnosed with autism spectrum disorder. From 2003 to 2007, Randi was stationed near Omaha, Nebraska, in her capacity as a lieutenant colonel in the U.S. Army. In July 2007, the Army transferred Randi to Fort Leavenworth, Kansas.

On April 15, 2008, a decree of dissolution of marriage had been entered in this matter. At the time of the divorce, Brian and Jakob resided in Plattsmouth and Randi resided in Fort Leavenworth. The parties agreed to joint legal custody with Brian being the primary custodial parent. Randi had parenting time with Jakob every other weekend and for extended periods of time over the summer.

In August 2010, Randi was promoted to colonel and was transferred to Fort Knox, Kentucky. After being restationed, Randi continued to exercise parenting time with Jakob once a month and for extended periods over the summer. The parties exchanged Jakob in Rock Port, Missouri, and Randi took Jakob to her sister's home in Platte City, Missouri, during her

parenting time. Randi made sure that Jakob was involved in educational activities and "applied behavioral analysis" (ABA) therapy during the summer visitation periods.

In December 2010, Brian filed a complaint for modification seeking permanent removal of Jakob from Nebraska and seeking sole legal and physical custody subject to Randi's parenting time. Brian also alleged a material change of circumstances because Randi earned a promotion and a change of income, which necessitated a change in the child support order.

Brian met his current wife, Sheri Steffy, during December 2010, and they married in April 2011. Brian and Sheri reside in Plattsmouth with Jakob and Sheri's children from a previous marriage. Brian graduated with a degree in elementary education in May 2011. At the time of trial, he was a substitute teacher in Bellevue, Nebraska, where he was paid between $125 and $140 per day. Brian also received $1,800 per month from a military pension and, at the time of trial, received approximately $1,146 per month in child support from Randi. Sheri was under an employment contract with the Bellevue school system, where she earned approximately $54,000 per year as a teacher.

At trial, Brian testified that a teacher with his experience in the greater Omaha area would earn an annual salary between $30,000 and $31,000. Brian obtained salary information for a number of school districts near Dallas-Fort Worth, Texas. A teacher with the same credentials in the Dallas-Fort Worth metropolitan area could earn a salary ranging from $47,000 to $50,000. Brian stated that he would like to move to a school district offering higher pay and was attracted to Texas because it does not have a state income tax.

Brian testified he would also like to live in Texas because it would be closer to some of his extended family, including his mother, his brothers, his sister-in-law, a nephew, and some stepsiblings, all of whom live within the state. Brian said he considered how the move would affect Randi, and he determined the trip from Dallas-Fort Worth to Louisville, Kentucky, is equal to the distance from Louisville to Omaha. Brian stated he would be willing to accommodate monthly visitation by meeting Randi halfway between Dallas-Fort Worth

and Louisville, or Dallas-Fort Worth and either Kansas City, Missouri, or Kansas City, Kansas. This distance is approximately the same as their arrangement to meet between Louisville and Plattsmouth.

Keery Wolf, of Wolf Behavioral Consulting, testified that Jakob has restricted interests, stereotypic or repetitive behaviors (such as putting things in a specific place or hitting his leg over and over), lack of verbal communication, and social skills deficits. Wolf is one of Jakob's therapists and is a certified behavior analyst in ABA. ABA is the science of behavior change; either increasing appropriate behaviors, decreasing inappropriate behaviors, or both.

Wolf said that ABA therapists are at Jakob's school to work one-on-one with Jakob and that paraprofessionals from the school also learned what the ABA therapists do so the techniques could be used with Jakob during the rest of the day. Wolf spent at least 1 hour per week or 2 hours every other week with Jakob to verify that he was progressing, and she said that between October 2010 and the end of the 2011 school year, Jakob "progressed wonderfully." Wolf stressed that Jakob will need to continue ABA services because he has autistic characteristics and because he responded well to ABA therapy.

Brian testified that Jakob's ABA services are at risk. Brian offered evidence that Wolf's business is one of very few providing ABA services in Nebraska, but indicated that there are opportunities for the same type of therapy in Texas. Brian stated concern that Jakob's treatment would become unavailable in Nebraska if Wolf's business did not continue providing the same services. Wolf testified that although she could not provide the names of any ABA services in Dallas-Fort Worth, she knew there were a "good number" available, noting there were more providers in Texas than in Nebraska.

Brian also testified that his primary concern was making sure the ABA services, speech therapy, and occupational services for Jakob in Texas would be as good as or better than the services provided in Nebraska. He stated he believed moving would be in Jakob's best interests because of the plethora of ABA-related businesses in Texas. He personally visited one

business and took Jakob there to visit and be observed. He also stated that Texas would be more favorable because insurance mandates require coverage of Jakob's treatment in the state and that the same type of mandates are not in place in Nebraska. He also testified that he believed he would be able to earn more money to support Jakob's care.

The district court sent a letter to the parties on October 19, 2011, following the modification proceedings on August 25. The court increased the child support owed from Randi to Brian from $1,046 to $1,365.71 per month. The court also found Brian did not meet the tests for showing a legitimate reason to leave the state, and it denied Brian's request to remove Jakob from the state. The court's order was filed in the district court for Cass County on January 26, 2012. Brian appealed the order of the district court on February 1.

### III. ASSIGNMENTS OF ERROR

[1] Brian does not specifically assign errors in accordance with Nebraska's rules of appellate procedure. However, an appellate court may, at its option, notice plain error. *United States Cold Storage v. City of La Vista*, 285 Neb. 579, ___ N.W.2d ___ (2013). We elect to do so in this case.

### IV. STANDARD OF REVIEW

[2,3] Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### V. ANALYSIS

[4,5] The Supreme Court has cautioned that parties who wish to secure appellate review of their claims for relief must be aware of, and abide by, the rules of the Nebraska Supreme Court and the Nebraska Court of Appeals in presenting such

claims. *In re Guardianship & Conservatorship of Larson*, 270 Neb. 837, 708 N.W.2d 262 (2006). Any party who fails to properly identify and present its claim in accordance with the Supreme Court rules does so at its peril and risks the appellate court's declining to address the claim. See *id*.

We note at the outset that Brian's brief does not comply with Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2008), which sets forth with specificity the nine sections required in an appellant's brief and the order in which they must appear. In relevant part, § 2-109(D)(1)(e) required:

> [a] separate, concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error. Each assignment of error shall be separately numbered and paragraphed, bearing in mind that consideration of the case will be limited to errors assigned and discussed. The court may, at its option, notice a plain error not assigned.

In this case, Brian does not set forth a separate section containing his assignments of error between the statement of the case and the propositions of law. Rather, a secondary table of contents refers to the page numbers on which his assignments of error are argued.

[6,7] The Nebraska Supreme Court has addressed briefing inconsistencies similar to the circumstances of this case and stated that it has long been the policy that to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *City of Gordon v. Montana Feeders, Corp.*, 273 Neb. 402, 730 N.W.2d 387 (2007). Recently, the Supreme Court considered a case in which the appellant's brief did not contain a separate "assignments of error" section stating the assigned errors apart from the arguments in the brief. The court held that "[a]ssignments of error consisting of headings or subparts of argument do not comply with the mandate of § 2-109(D)(1)(e)." *In re Interest of Jamyia M.*, 281 Neb. 964, 977, 800 N.W.2d 259, 269 (2011).

[8,9] In such situations, the court may consider the case as one in which no brief was filed, or, alternatively, the court may

examine the proceedings for plain error. *Id.* "Plain error" is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id.*

We review the record for plain error, and, upon review, we find plain error is present for the reasons set forth below.

### 1. APPLICATION OF THRESHOLD TEST REQUIRING LEGITIMATE REASON TO REMOVE CHILD FROM NEBRASKA

[10] In Nebraska, the standards set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), and *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005), are commonly used to test whether a parent has met the burden to remove a minor child from the state. In *Wild*, this court stated:

> The relevant test to be applied in cases where a custodial parent seeks court permission to remove a minor child from the state has been set forth by the Nebraska Supreme Court on numerous occasions. See, *Tremain v. Tremain*[, 264 Neb. 328, 646 N.W.2d 661 (2002)]; *McLaughlin v. McLaughlin*[, 264 Neb. 232, 647 N.W.2d 577 (2002)]; *Vogel v. Vogel*[, 262 Neb. 1030, 637 N.W.2d 611 (2002)]; *Brown v. Brown*[, 260 Neb. 954, 621 N.W.2d 70 (2000)]; *Jack v. Clinton*[, 259 Neb. 198, 609 N.W.2d 328 (2000)]; . . . *Farnsworth, supra.* In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.* Under Nebraska law, the burden has been placed on the custodial parent to satisfy this test. See . . . *Brown, supra.*

13 Neb. App. at 503, 696 N.W.2d at 895.

Brian argues the district court abused its discretion in applying the tests to this case because the noncustodial parent, Randi, no longer lives in Nebraska and she should not be allowed to

tether him to the state. He argues that Randi has not resided in Nebraska since the inception of the divorce action and that she does not exercise her visitation within the state. He argues that she no longer has sufficient contacts within the state and that she should not be given the same remedies as parents within the state, because her "career choices have isolated her from" the state. Brief for appellant at 17.

This court has consistently applied the above test to situations where parents request removal of a child, whether or not the noncustodial parent lives in Nebraska. See *Colling v. Colling, ante* p. 98, 818 N.W.2d 637 (2012), where both parties resided in Nebraska. See, also, *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008) (custodial parent, who relocated after being granted permission to remove children, sought subsequent move to yet another state); *Tirado v. Tirado*, No. A-11-517, 2012 WL 882509 (Neb. App. Mar. 13, 2012) (selected for posting to court Web site) (noncustodial parent lived outside of Nebraska and sought to prevent custodial parent in Nebraska from moving to another state).

The lower court recognized that the facts of this case presented a somewhat unusual issue due to Randi's living outside of Nebraska, but the court ultimately determined it should not "deviate from the Nebraska jurisprudence as set forth in" *Farnsworth, supra*, "and the cases following *Farnsworth*." We recognize that in *Farnsworth*, the court's primary concern was to avoid disturbing the relationship between the child and the noncustodial parent, who has a consistent physical presence in the child's life. When the noncustodial parent is geographically removed from the child, however, it is uncertain whether the custodial parent must prove a legitimate reason for leaving the state as *Farnsworth* requires. Nonetheless, in the present case, Brian established a legitimate reason for his proposed move.

## 2. Legitimate Reason for Removal From Nebraska

[11] The threshold question in removal cases is whether the parent wishing to remove the child from the state has a legitimate reason for leaving. See *Farnsworth v. Farnsworth*, 257

Neb. 242, 597 N.W.2d 592 (1999). In this appeal, Brian argues that this standard does not apply to his situation. We determine that even if this standard applies, the trial court erred in finding that Brian had not met his burden of proving he had a legitimate reason for leaving the state.

[12,13] Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state. *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). Such legitimate employment opportunities may constitute a legitimate reason when there is a reasonable expectation of improvement in the career or occupation of the custodial parent. *Id*.

Brian provided evidence of his current income as a substitute teacher in Bellevue and evidence that a full-time teacher with his experience in the greater Omaha area would receive an annual salary between $30,000 and $31,000. He also testified he has had difficulty finding full-time employment in school districts in Nebraska.

Brian obtained salary information for a number of school districts near Dallas-Fort Worth. He provided evidence that a teacher with the same credentials in the Dallas-Fort Worth metropolitan area could earn a salary ranging from $47,000 to $50,000. Brian's employment-related reasons for moving to Texas included finding full-time employment in a school district offering higher pay and the lack of a state income tax in Texas. Brian testified that although there were many teaching positions available in Texas, he did not apply for any positions, because he had not yet received permission to leave Nebraska and thus would not have been able to accept a contract if one were offered. He also stated he waited to apply because he did not want to pay the certification costs for Texas until he was given permission to move. Sheri also researched teaching certification and jobs available in Texas, but decided not to apply until she and Brian were granted permission to move. She said, "[I]t would be premature to apply for something if we don't have permission to leave."

Brian wishes to pursue employment in Texas, where he could possibly earn nearly $20,000 more per year than with a full-time salary for a comparable job in Nebraska. The

*Farnsworth* court stated that "job-related changes are legitimate reasons for moving where there is a 'reasonable expectation of improvement in the career or occupation of the custodial parent,'" and that "where the custodial parent's new job included a small increase in salary and increased potential for salary advancement." 257 Neb. at 252, 597 N.W.2d at 600. The information Brian provided shows he has considered his choices carefully, and he set forth a reasoned discussion of why he should be allowed to move to Texas to pursue greater employment opportunities.

In previous Nebraska cases, courts have granted permission to remove a child in situations where parents showed they were actively pursuing employment; that they have applied for jobs, have interviews scheduled, or have received offers of employment. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). See, also, *Jafari v. Jafari*, 204 Neb. 622, 284 N.W.2d 554 (1979). However, this case offers a unique set of facts and is distinguishable from other Nebraska cases in that the custodial parent, Brian, is tethered to Nebraska, while the noncustodial parent, Randi, is not. Currently, Brian is required to remain a resident of Nebraska, even though Randi does not live, work, or exercise her parenting time within the state.

Jakob's education and treatment for autism spectrum disorder are further reasons Brian sought permission to move to Texas. Brian testified his primary concern when considering relocation was the continuation of ABA services, speech therapy, and occupational services for Jakob. Brian noted there are a plethora of service providers in Texas while, in contrast, Nebraska has very few.

Wolf testified that though there are other ABA service providers in eastern Nebraska, she is the only ABA-board-certified behavior analyst that provides services in schools and homes. Wolf stated that her company, Wolf Behavioral Consulting, is currently Jakob's service provider and that he receives approximately 12 to 15 hours of ABA services in school per week. She said it is important for children with autism spectrum disorder to have the same quality of services throughout the year. She also testified that Jakob qualifies for extended school year

services, which are provided during the summer with the goal of helping children maintain the progress made throughout the year.

Wolf testified that her company is going to start "going in a different direction" and that unless another board-certified behavior analyst is found to pick up her services, there could be a gap in services for Jakob. Wolf said that there are more board-certified providers in Texas than in Nebraska and that she was personally familiar with one provider in Texas. Brian also testified that he was familiar with one provider in Texas. Brian said Jakob had already visited and been observed by that provider. Brian noted there is an insurance mandate in Texas which would ensure that Jakob would receive the treatment necessary for his diagnosis. Also, a larger pool of service providers would make it more likely that Jakob would receive the continuity of services he requires. Brian stated his belief that Texas would be a better place for Jakob academically, behaviorally, and therapeutically.

We find that Brian has provided enough information, under these specific circumstances, to show that the pursuit of full-time employment in Texas and the increased educational and therapeutic opportunities for Jakob are legitimate reasons to remove Jakob from Nebraska.

A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

While operating under the assumption that *Farnsworth* applies, the trial court found that Brian failed to meet his burden of showing a legitimate reason for removal. Without determining whether *Farnsworth* applies in this case, we find that the trial court abused its discretion, as Brian showed that the employment opportunities for him and for his current wife, Sheri, as well as the educational advantages for Jakob in Texas, are legitimate reasons for leaving Nebraska.

### 3. Best Interests of Minor Child

[14,15] After clearing the threshold of showing a legitimate reason for leaving the state, the custodial parent must next

demonstrate that it is in the child's best interests to continue living with him or her. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Whether the proposed move is in the best interests of the child is the paramount consideration. *Id*. See, also, *Evenson v. Evenson*, 248 Neb. 719, 538 N.W.2d 746 (1995).

[16] In determining whether removal to another jurisdiction is in the child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Farnsworth, supra*.

(a) Each Parent's Motives

[17] The first factor that must be considered is each parent's motives for seeking or opposing the removal of the minor child from the jurisdiction. The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007).

The evidence shows that Brian sought removal for a variety of reasons, including greater access to ABA services for Jakob, the potential for a better job, and to be closer to his extended family. We do not find any evidence that Brian sought removal in an effort to manipulate Randi or interfere with the established parenting time schedule.

We find that Randi opposed removal because it could potentially affect her parenting time. However, there is no evidence she would not be able to maintain the same schedule of monthly visits and extended time with Jakob during the summer. Randi also expressed concern that the move would make it difficult to continue exercising her parenting time at her sister's home and could require hotel rental. However, Brian has demonstrated his willingness to continue a similar transportation arrangement for Randi's parenting time, and

he has chosen a location that would require roughly the same travel distance and time, so Randi could continue her time with Jakob in her sister's home. This factor does not weigh against removal.

### (b) Quality of Life

[18] The second factor that must be considered is the potential that the move holds for enhancing the quality of life for the child and the custodial parent. This factor requires an analysis of other considerations which bear upon the potential enhancement of the child's quality of life. *Wild, supra*.

[19] In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court evaluates the following considerations: the emotional, physical, and developmental needs of the child; the child's opinion or preference as to where to live; the extent to which the relocating parent's income or employment will be enhanced; the degree to which housing or living conditions would be improved; the existence of educational advantages; the quality of the relationship between the child and each parent; the strength of the child's ties to the present community and extended family there; and the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. See *id*. This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted. *Id*.

### (c) Emotional, Physical, and Developmental Needs

Jakob is a child with special needs, and currently those needs are being met in Plattsmouth. He receives occupational therapy, speech therapy, and ABA services at his school. Jakob has been in the same school system since he began school, and he is surrounded by familiar faculty, staff, and students. The evidence shows this stability is beneficial for Jakob, and we do not diminish its importance in his education.

However, there is evidence that the same services may not be available in the future. Wolf, a provider of Jakob's ABA services, testified that her business is changing, and there is the potential that she will stop providing such services or that another service provider will take the place of her business. There is also evidence that similar businesses are more prevalent in Texas, and Jakob has had contact with at least one such business in the past. Whether Jakob moves to Texas or remains in Nebraska, there is a potential for change in the ABA services he receives. The likelihood of a change in Wolf's business, resulting in a loss of ABA services for Jakob, weighs in favor of removal.

### (d) Jakob's Opinion or Preference

Jakob did not testify at trial, and there is no evidence to reflect his preference. This factor does not weigh for or against removal.

### (e) Enhancement of Income
### or Employment

As addressed more fully above, Brian requested to move to Texas to pursue full-time employment as a teacher. He currently is a substitute teacher and has had difficulty obtaining full-time employment in Nebraska. If he were to obtain a full-time job in Texas, he could potentially earn more, as the base salary for teachers in Texas is higher than that in Omaha. He would also be able to retain more of his income, as there is no state income tax in Texas.

He also testified that in Texas, there is an insurance mandate requiring insurance companies to cover treatment for services to people with special needs. This mandate would include coverage for Jakob's ABA services and could potentially take some of the financial burden off of Brian. This same mandate is not in effect in Nebraska, and if Brian's insurance decided to stop paying for Jakob's services, Brian would be responsible for paying for the services. This factor weighs in favor of removal, as the move could enhance Brian's income and employment, as well as ensure insurance coverage so Jakob

would continue to receive the treatment he needs without an additional financial burden on Brian.

### (f) Housing or Living Conditions

The evidence does not reflect housing or living conditions either in Nebraska or in Texas, so these factors do not weigh for or against removal.

### (g) Quality of Relationship Between Child and Parents

The record in the present case indicates that Jakob has a good relationship with both parties, and there is no evidence that removal will adversely affect those relationships. Jakob would continue to live with Brian, and Randi would continue to have parenting time according to the established schedule. This factor weighs in favor of removal.

### (h) Ties to Community and Extended Family

The evidence shows that Jakob has lived in the same community since the age of two and that he is familiar with its people and surroundings. The trial court accurately stated, "Jakob's ties to the present community . . . are clear." However, he has no extended family in that community or anywhere in Nebraska. Randi's parents live in South Dakota, and Randi's sister, as previously stated, lives in Missouri. Jakob has a relationship with these family members, but he would still be able to see them and spend time with them during Randi's parenting time if she continued to exercise it in Missouri.

A move to Texas would provide Jakob with greater access to Brian's extended family. Brian testified that several of his family members live in Texas. This includes Brian's older brother and his wife in Grand Prairie, Brian's nephew in Farmer's Branch, Brian's sister in Richardson, Brian's younger brother in Rio Grande Valley, and Brian's mother and several stepsiblings in other parts of the state. Additionally, Sheri has extended family in Oklahoma.

There are benefits both to living in Nebraska and to living in Texas with regard to this factor, but, overall, the benefits weigh in favor of removal.

### (i) Hostilities Between Parties

Another element to consider when determining whether removal will enhance the quality of life for a child is the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005).

The trial court's letter indicates a finding that though Brian and Randi have worked together in the past, this removal will create hostilities between the parties.

However, a review of the record indicates removal would not necessarily antagonize hostilities between the parties. Brian testified at trial that he and Randi have a history of working together for Jakob's benefit. The record indicates Brian and Randi have adjusted Randi's parenting time to accommodate her schedule, and Brian and Randi routinely met between Plattsmouth and Platte City to minimize the amount of parenting time Randi spent driving. There is no evidence that this arrangement could not continue, as Brian has demonstrated his willingness to meet her halfway from Texas.

We find this factor does not weigh in favor of or against removal.

### (j) Conclusion on Quality of Life

Our de novo review of the record leads us to a conclusion that the quality of life considerations weigh in favor of allowing Brian to permanently remove Jakob from Nebraska. In the present case, the various considerations either weighed in favor of removal or were roughly equal. Overall, the evidence in the record demonstrates that the proposed removal from Nebraska will enhance Jakob's quality of life without jeopardizing his treatment, his education, or the time spent with Randi.

### (k) Impact on Relationship With Noncustodial Parent

Currently, Randi exercises her parenting time with Jakob on weekends and for extended periods over the summer months. Randi testified that the nature of her position with the Army makes it difficult for her to take time off and that she has

to request a "pass" or be on ordinary vacation leave anytime she needs to leave Louisville to see Jakob. Typically, she travels from Louisville to Missouri and meets Brian halfway between her sister's home and Brian's home. Then Randi and Jakob return to her sister's home for the remaining period of her parenting time. Brian testified that the distances between Louisville and Plattsmouth and between Louisville and Irving, Texas, are roughly the same and that he would be willing to continue with the same type of arrangement for meeting and transferring Jakob to Randi's care for parenting time. Regardless of whether Jakob lives in Nebraska or Texas, Randi will still have to travel for parenting time, and she will still be able to exercise her parenting time in Missouri. Additionally, removal will not affect Randi's ability to exercise parenting time with Jakob during the summer in Louisville.

Randi and Brian do not live or work in the same community, so Brian's move with Jakob to a place that is roughly equidistant from Randi's home will not jeopardize Randi's time with Jakob. Under the circumstances, there is no evidence the move from Plattsmouth to Texas will greatly affect the relationship between Randi and Jakob, and this factor weighs in favor of removal.

### (l) Conclusion on Best Interests

A de novo review of the evidence shows that the parents were not motivated by an effort to frustrate or manipulate each other, that the move would enhance Jakob's quality of life, and that the move would not greatly impact the relationship between Randi and Jakob. The record demonstrates sufficient evidence that it is in Jakob's best interests to allow Jakob to be removed from Nebraska to Texas.

### (m) Conclusion on Removal

We conclude that Brian has adduced sufficient evidence to show a legitimate reason to leave Nebraska and that the move would be in Jakob's best interests. We find it was an abuse of discretion for the trial court to require Brian to remain in Nebraska with Jakob, because under the unique circumstances

of this case, the trial court's decision deprives Brian of a just result.

### (n) Unconstitutional Burden
### on Travel

[20,21] Brian argues that the federal Constitution provides a fundamental right to interstate travel, which should permit him to relocate from Nebraska to Texas. An appellate court will not consider an issue that was not passed upon by the trial court. See *Capital City Telephone v. Nebraska Dept. of Rev.*, 264 Neb. 515, 650 N.W.2d 467 (2002). Further, the Nebraska Supreme Court has held that a constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal. *Id*. See *In re Adoption of Luke*, 263 Neb. 365, 640 N.W.2d 374 (2002). This issue was not presented or passed upon during trial before the lower court and, thus, cannot be raised for the first time on appeal. Therefore, we decline to consider this issue.

### VI. CONCLUSION

Assuming without deciding whether a custodial parent must meet the requirements of *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), when the noncustodial parent resides outside of the state, the evidence supports the conclusion that Brian proved both a legitimate reason for removal and that removal from Nebraska to Texas is in Jakob's best interests. We find plain error and reverse the decision of the district court, which denied Brian's request for removal.

The portions of the district court's order unrelated to removal are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED.