connection between Roness' employment and her carpal tunnel syndrome. The compensation court was clearly wrong with respect to its specific findings about what Dr. Gilles actually opined and with respect to its finding that Dr. Gilles' opinion was sufficient for the award of benefits.

### 3. DR. SOLLENDER'S OPINION

The only other medical evidence in our record was adduced on behalf of Wal-Mart, in the form of the report of Dr. Sollender, an independent physician who examined Roness and her medical records. Dr. Sollender's opinion was specifically that Roness' current bilateral carpal tunnel syndrome was not caused by her employment.

### V. CONCLUSION

In this case, Roness had the burden to adduce sufficient medical testimony to establish a causal connection between the alleged injury, the employment, and the disability. The evidence adduced establishes that she suffered bilateral carpal tunnel syndrome, but does not include any medical testimony opining that her injury was caused by her employment. As such, the compensation court was clearly wrong in finding the evidence sufficient to support an award of benefits. We reverse.

REVERSED.

———————————

MELANIE L. DRAGON, NOW KNOWN AS
MELANIE L. TUAMOHELOA, APPELLANT, V.
CHRISTOPHER P. DRAGON, APPELLEE.

___ N.W.2d ___

Filed September 3, 2013.    No. A-12-1030.

1.  **Child Custody: Visitation: Appeal and Error.** Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.
2.  **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and

unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Child Custody.** In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her.

4. ____. Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state.

5. ____. Legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state where there is a reasonable expectation of improvement in the career or occupation of the custodial parent, or where the custodial parent's new job includes increased potential for salary advancement.

6. ____. A custodial parent is not required to exhaust all possible job leads locally before securing a better position in another state.

7. ____. In determining whether removal to another jurisdiction is in a child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

8. ____. The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party.

9. ____. In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties.

10. ____. The list of factors to be considered in determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted.

11. ____. Where the evidence does not establish any significant improvement in housing or living conditions, that factor does not weigh in favor of or against a child's removal to another jurisdiction.

12. ____. In considering removal of a child to another jurisdiction, the existence of educational advantages receives little or no weight when the custodial parent fails to prove that the new schools are superior.

13. ____. The effect of the removal of a child to another jurisdiction must be evaluated in light of the child's relationship with each parent.

14. **Child Custody: Visitation.** A noncustodial parent's visitation rights are important, but a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason.

15. **Child Custody.** In considering removal of a child to another jurisdiction, a court focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship.

Appeal from the District Court for Sarpy County: Max Kelch, Judge. Reversed and remanded for further proceedings.

Tracy L. Hightower-Henne, of Hightower Reff Law, L.L.C., for appellant.

Hugh I. Abrahamson, of Abrahamson Law Office, for appellee.

Pirtle and Riedmann, Judges, and Mullen, District Judge, Retired.

Pirtle, Judge.

## I. INTRODUCTION

Melanie L. Dragon, now known as Melanie L. Tuamoheloa, appeals the order of the district court for Sarpy County which denied her request to remove her minor child from the State of Nebraska and awarded sole custody of the child to Christopher P. Dragon. We find that Melanie had a legitimate reason to request removal and find upon our de novo review that Melanie sufficiently demonstrated removal would be in the child's best interests. We also find the trial court erred in determining that sole custody should be awarded to Christopher. Accordingly, we reverse the denial of Melanie's complaint to modify the decree.

## II. BACKGROUND

The parties divorced in 2005 and are the parents of Kendra Dragon, born in 2002. Pursuant to the decree of dissolution, the parties shared joint legal custody of the minor child and Melanie was awarded physical custody of Kendra. The parenting plan provided parenting time for Christopher with Kendra two evenings per week and every other weekend.

On April 23, 2012, Christopher filed a complaint for a temporary restraining order, preliminary injunction, and injunction, asking the court to prevent Melanie from removing Kendra from the State of Nebraska. Christopher also filed a motion for ex parte order requesting that the court prevent Melanie from permanently removing Kendra from the State of Nebraska. Melanie filed an answer and cross-complaint to modify the decree and gain permission to remove the minor child from the State of Nebraska to New Mexico. The parties stipulated that the child would not be removed without consent of the court.

Christopher's reply and answer to Melanie's cross-complaint alleged that "it is in the best interests of the parties' minor child that should [Melanie] leave the State of Nebraska that the care, custody and control of the minor child be with [Christopher]." Melanie's "Amended Motion for Expedited Trial or in the Alternative Motion for Temporary Allowances" requested the earliest possible trial date, permission for temporary removal, or permission from the court for Kendra to continue residing with Steven Tuamoheloa (Steven), her current husband and Kendra's stepfather, in Omaha, Nebraska, until trial.

Christopher objected to Melanie's motion and opposed temporary removal. Christopher's motion for temporary custody filed on July 27, 2012, stated it was not in Kendra's best interests to be placed in the custody of Steven. Christopher also stated it was in Kendra's best interests that when Melanie relocated from the State of Nebraska, he should retain the care, custody, and control of her. Although he mentions custody, he did not file a counterclaim requesting a change of custody.

Trial regarding removal took place on September 25 and 27 and October 23, 2012.

Melanie requested permission to remove Kendra from the State of Nebraska because she was moving to New Mexico to accept a job offer after completing her nursing degree. Melanie testified she was a stay-at-home mother with no employment income until she earned her degree from Creighton University in May 2012. Melanie is an enrolled member of the Omaha Tribe of Nebraska. She received a scholarship through Indian

Health Service, which paid for 2 years of nursing school. She also received a stipend in the amount of $18,000 for living expenses.

The scholarship required Melanie to be enrolled full time in nursing school and maintain a 3.0 grade point average. The scholarship also required Melanie to secure employment within 90 days of graduation, specifically at an Indian health care facility, and she was required to work for a year for each year the scholarship funded her education. Thus, Melanie was obliged to work for 2 years for an Indian health care facility. Should Melanie fail to meet the postgraduation requirement, she would be required to pay back the scholarship, totaling $80,000.

Melanie searched for employment with an Indian health care facility upon graduation, using the Indian Health Service Web site. She testified that there are two facilities in Omaha which would have fulfilled the requirement, but that there were no job opportunities available within 90 days at either facility. She expanded her search nationwide. She was unable to secure a job at a facility in Rapid City, South Dakota, because she did not have enough experience. She was offered positions at two facilities: one in Gallup, New Mexico, and one in Anchorage, Alaska. She accepted a job as a registered nurse with the Gallup Indian Medical Center and moved to New Mexico in August 2012. Because Melanie did not have permission to remove Kendra from Nebraska at that time, Kendra remained in Nebraska with Christopher.

Melanie immediately received benefits through her employer, including health insurance, a retirement plan, life insurance, vision and dental insurance, and long-term advancement training opportunities. She testified that if she maintains her job at this facility beyond 2 years, she will receive loan repayments totaling approximately $115,000.

Melanie married her current husband, Steven, 7 years ago, and they have three children together. Melanie testified that Kendra has two men that she calls "dad," Christopher and Steven. Melanie said Kendra has a loving relationship with Steven; they play together, and she is treated in the same way as the other children. Steven testified that he is active in

parenting Kendra and has been a part of her life since she was 2 years old. He said that "she's basically my first kid." Kendra is also bonded with her half siblings and takes a leading role as the oldest sibling. She enjoys playing with them and reading to them and likes to "play Barbies" and "dress up" with her half sister.

Melanie sought permission to remove Kendra from Nebraska so that she could live with Melanie and the family in New Mexico. Melanie was Kendra's primary caregiver from birth, and has remained in that role since the parties divorced, approximately 9 years ago. Melanie has been very involved in Kendra's schooling and activities and enjoys a loving relationship with her. Melanie testified that she takes Kendra to all of Kendra's medical appointments and talks to her about issues with school, friends, and concerns relating to puberty. Christopher has not provided health insurance for Kendra, despite being ordered to do so in the original decree, and did not know the names of Kendra's doctors or dentist.

Melanie testified that she helps Kendra with her homework and reviews incorrect answers to make sure she understands the work. Melanie expressed concern about the decline in Kendra's schoolwork since she began living with Christopher. Melanie received an e-mail from Kendra's teacher saying that she noticed a decline in Kendra's work and work habits and that her grades were in decline.

Melanie testified that if Kendra were allowed to move to New Mexico, she would live with the family in a leased three-bedroom home and would continue to share a room with her half sister. The home is one block away from the school Kendra would attend, and this is much closer than the distance between her home and school in Omaha. She said that there are no concerns about the size or safety of the home and that the neighborhood is comparable to their neighborhood in Omaha.

Melanie's extended family lives in Omaha, and she testified they would travel to Omaha to see extended family every few months. Melanie's father testified that they planned to visit New Mexico "[m]aybe six times a year" and that he was not concerned about any strain on the relationship between Kendra

and her extended family in Omaha. Melanie testified that Christopher would have unlimited access to Kendra through "Skype" calls, e-mails, and frequent telephone calls. She also said that she would be willing to pay for the majority of transportation costs for Kendra to visit Christopher or that she would be open to a deviation in child support if Christopher paid for a portion of transportation. She testified she would agree to Kendra's spending the majority of the time spent visiting in Omaha with Christopher.

If Christopher was awarded custody, Kendra would continue to live with Christopher, Christopher's fiance, and their 1-year-old daughter. Christopher testified that Kendra is close to his younger daughter and has a good relationship with his fiance. Kendra would continue to attend elementary school in Omaha's Millard school district, although they live in the Bellevue school district.

Christopher stated that he wants Kendra to stay in Nebraska, because it is where she was born and he wants to have a regular relationship with her. Melanie agreed that Kendra and Christopher have a good relationship and said she believes it is important for Kendra to maintain her relationship with her father. Christopher testified that his father, grandparents, aunts, and uncles live in Omaha. He testified that his mother lives out of town and that they do not spend much time together or communicate often. Christopher testified that he has two brothers and that he does not have a strong relationship with them. He testified that one brother is a convicted sex offender.

Christopher also testified that he was convicted of "[f]elony of a forged instrument" and successfully completed probation. He testified that he was aware that the Nebraska Revised Statutes prohibit felons from being in the possession of firearms. Christopher testified that he enjoys hunting and had used a gun prior to his conviction. He said he switched to a bow and arrow after the conviction and has not been hunting with a gun since 1999. Christopher's fiance testified that she provided him with a hunting permit as part of her duties working with the wildlife and parks department. She also said that

she was with Christopher the last time he hunted and that he used a shotgun.

Melanie stated she was concerned because Kendra was seeing her maternal grandmother two to three evenings per week and Christopher has been cutting their time together shorter and shorter. Melanie's mother testified that she did not get to see Kendra as much as she did before Melanie moved to New Mexico. Melanie also expressed concerns about whether Christopher would hinder her relationship with Kendra, because she was allowed to see Kendra for only 3½ hours after Melanie had been gone for 4 weeks.

A clinical psychologist testified that she met with Kendra on two occasions and also met with Christopher. She testified that Kendra is bonded to her family members and that she loves Melanie and Christopher and is happy with both of them. The psychologist testified that Kendra misses her mother, stepfather, and siblings, and she said it helps Kendra to have contact with Melanie every day on the telephone. The psychologist testified that the opinion she submitted in her report was that Kendra should stay in Nebraska.

The psychologist testified that she has made this type of recommendation before, and that she typically prefers to "grill the mother, grill the father and meet with the children once, twice. If additional times are needed, whatever seemed to fit the family's needs." She did not meet with Melanie prior to submitting her report in this case. She said that she would have preferred to meet with both parents and both attorneys together, but that it did not happen in this case. She said she represents the children in these situations but acknowledged that her report could "be slightly more swayed by [Christopher] because [she] didn't have contact with [Melanie]."

The court entered an order of modification on October 30, 2012, denying Melanie permission to remove Kendra from the State of Nebraska. The trial court concluded Melanie failed to satisfy the threshold test of proving that there was a legitimate reason to leave the State of Nebraska and that removal was in Kendra's best interests. Additionally, the trial court modified

custody, awarding Christopher physical custody, as well as the right to claim the tax exemption for Kendra every year.

Melanie was awarded reasonable visitation and was ordered to pay 100 percent of all travel expenses and $293 per month to Christopher for child support. She was also ordered to provide health and dental insurance for Kendra through Melanie's employer.

Melanie filed her notice of appeal on November 2, 2012.

## III. ASSIGNMENT OF ERROR

Melanie asserts the trial court erred in denying her request to remove Kendra from the State of Nebraska.

## IV. STANDARD OF REVIEW

[1,2] Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id*.

## V. ANALYSIS

[3] In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

### 1. LEGITIMATE REASON
### FOR LEAVING STATE

Melanie argues that the district court erred in finding that she did not have a legitimate reason for leaving Nebraska. At trial, Melanie provided evidence that she moved to New

Mexico to accept a position with a facility in the Indian health care network. Accepting this position would help her to fulfill the conditions placed upon her as a result of the scholarship she received to pay for her nursing degree. She testified that she was required to obtain a position within 90 days after graduation or she would be forced to repay approximately $80,000 for the scholarship and $18,000 for living expenses.

She presented evidence that she made an effort to find nursing positions in Omaha and surrounding areas, but that Omaha did not have any openings within the 90 days. She testified that she applied for a position in Rapid City because it was relatively close to Omaha, but that she was denied that position because she did not have the required experience. She was offered positions in Gallup and Anchorage. The position she accepted in Gallup would also provide a steady income, benefits, and the possibility for advancement and additional income and incentives if she maintained the position for longer than 2 years.

The district court determined that Melanie had the burden to show that she made reasonable efforts to gain employment in Nebraska before seeking employment outside of Nebraska and indicated her search of the Indian Health Service Web site may not have been sufficient. The court acknowledged that avoiding repayment of financial aid is reasonable, but stated that "the evidence was lacking as to whether the only available financial aid to [Melanie] was this particular type of financial aid, which is attached to an Indian health clinic." Further, the court stated Melanie is required to examine similar employment opportunities in Nebraska before looking to another state.

[4] In making these findings, the district court imposed burdens which have not been held to be the standard by this court. Rather, this court has repeatedly held that legitimate employment opportunities for a custodial parent may constitute a legitimate reason for leaving the state. *Steffy v. Steffy*, 20 Neb. App. 757, 832 N.W.2d 895 (2013); *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007). See, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000); *Jack v. Clinton*, 259 Neb. 198, 609

N.W.2d 328 (2000); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

[5] We have also stated, and recently reaffirmed, that such legitimate employment opportunities may constitute a legitimate reason where there is a reasonable expectation of improvement in the career or occupation of the custodial parent, or where the custodial parent's new job includes increased potential for salary advancement. See, *Jack v. Clinton, supra*; *Steffy v. Steffy, supra*.

[6] There is no standard that the custodial parent must seek employment in Nebraska prior to looking in other states, and there is no burden that a parent must investigate all types of financial aid before accepting a scholarship. Rather, the Nebraska Supreme Court has stated, "[W]e have never required a custodial parent to exhaust all possible job leads locally before securing a better position in another state." *Farnsworth v. Farnsworth*, 257 Neb. at 252-53, 597 N.W.2d at 600. The evidence considered by the trial court is relevant, but it would be more appropriate to consider this information when weighing the child's best interests.

Melanie provided evidence that the position in New Mexico can be expected to improve or advance her career as a nurse, as well as provide increased income for the family. Further, there is additional evidence that if Melanie failed to accept a position within 90 days after graduation, she would be forced to pay a significant amount of money for failing to meet the requirements of her scholarship. Melanie was required to begin her position within 90 days of graduation, and as a result, she was required to leave Kendra in Omaha with Christopher and move to New Mexico right away. She then sought permission to remove Kendra from Nebraska.

Melanie essentially had two choices: stay in Nebraska with Kendra and attempt to obtain similar employment, knowing that she would not be able to fulfill the requirements of her scholarship and would likely be responsible for paying back the entirety of her scholarship funds, or take a job in New Mexico which would fulfill the requirements of her scholarship and hope the court would approve her request for Kendra's removal. She chose the latter.

While one might conclude it was imprudent for Melanie to move to New Mexico and begin a job while petitioning the court for permission to leave the state, it cannot be said that her request was not legitimate. We find the district court erred in determining Melanie's evidence of a legitimate reason to leave the state was "questionable."

## 2. BEST INTERESTS

Having determined Melanie did meet the threshold requirement, we will consider upon our de novo review whether she demonstrated that removing Kendra from Nebraska is in Kendra's best interests. See *Farnsworth v. Farnsworth, supra*.

[7] In determining whether removal to another jurisdiction is in the child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Steffy v. Steffy*, 20 Neb. App. 757, 832 N.W.2d 895 (2013).

### (a) Each Parent's Motives

[8] The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party. *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007).

The evidence shows Melanie sought removal because she was unable to find a job in Omaha that fulfilled the requirement, imposed by her scholarship, of employment within 90 days of graduation. There is no evidence that she sought employment in New Mexico to frustrate or manipulate Christopher, and she stated her intention to continue to foster his relationship with Kendra.

The evidence shows Christopher opposed removal because it would potentially affect his parenting time. We do not find his opposition was an attempt to frustrate or manipulate Melanie.

We do not find either party acted in bad faith, and this factor does not weigh for or against removal.

### (b) Quality of Life

[9] In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties. *Wild v. Wild, supra*.

[10] This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted. *Id*.

### (i) Emotional, Physical, and Developmental Needs

We first consider the impact on the child's emotional, physical, and developmental needs in assessing the extent to which the move could enhance the child's life.

The district court noted that Kendra has thrived in all areas of her life and that Kendra's emotional, physical, and developmental needs were being met by both parents in Nebraska. The court determined this factor weighed against removal from Nebraska, because after the initial stress of Melanie's relocation, Kendra appeared to be doing well in Christopher's home and because moving to New Mexico would result in far less contact between Christopher and Kendra.

The district court did not consider whether any of these needs would also be met by Melanie in New Mexico, and apparently did not consider the impact of Kendra's having less contact with Melanie. We believe this information should have been considered.

Upon our de novo review, we find the evidence shows Melanie was Kendra's primary caregiver from birth, and continued to be her primary caregiver and physical custodian after the parties divorced in 2005. Melanie was responsible for Kendra's daily needs, she took Kendra to routine doctor and dentist appointments, and she discussed Kendra's problems with her and helped her understand the changes she is going through as part of puberty. Melanie has been a constant in Kendra's life, and the evidence shows Kendra exhibited signs of mental and emotional stress when Melanie moved to New Mexico.

After the parties' divorce, Melanie married Steven and their three children were born. Kendra has lived with Melanie and Steven, her stepfather, since she was 2 years old and has lived with the other children since their birth. She has been a vital part of their family unit and enjoys her role as the oldest sibling. Kendra has been separated from not only her mother, but from her stepfather and half siblings, with whom she is emotionally attached.

Recently, Melanie decided to go back to school to study nursing and received a scholarship to help her gain her degree. Her years as a stay-at-home mother allowed her to provide a stable home life for her children. Her decision to begin a career as a nurse allows her to provide for her family in other ways. She now has access to expanded insurance benefits and increased income. Although they are not currently in the same state, Melanie communicates daily with Kendra and makes every effort to maintain their bond.

Christopher's affidavit states that since the original decree, he has spent a minimum of every other weekend from 5 p.m. Friday to 6 p.m. Sunday with Kendra. He has also participated in midweek visitation from 5 to 9 p.m. Monday and Thursday evenings, plus holidays and extended parenting time during the summer. The record is void of evidence that Christopher made efforts to maintain daily contact with Kendra when she resided with Melanie in Omaha.

Christopher currently lives with his fiance and their 1-year-old daughter. He testified that he personally enjoys hunting

deer and turkeys. Christopher is a convicted felon, and the testimony is in conflict as to whether he hunts with a bow and arrow or a shotgun. His fiance testified she was with him when he hunted 2 years ago and used a shotgun.

When asked how Christopher planned to handle the changes that are associated with a developing teenage girl, such as puberty, he responded, "My girlfriend would be able to talk to her about that stuff." Christopher also testified that he did not know the names of Kendra's regular pediatrician or dentist and that although he was ordered to provide insurance as part of the original decree, he did not do so at any time.

Melanie testified that when Kendra lived with her, Kendra came home from school, had a snack, and did her homework. Melanie made sure that Kendra's homework was complete, and they reviewed incorrect answers. Melanie testified that she received an e-mail from Kendra's teacher that her grades have dropped since she moved to Christopher's home, and Melanie is aware of a few instances when homework was not completed. Kendra's teacher said she noticed a decline in Kendra's work and work habits. Melanie said this information was surprising because Kendra always completed her work and asked questions when she had them. Kendra's grades improved between trial dates, but Melanie still had concerns about Kendra's keeping her grades up and maintaining them. She used the school's Web site to verify assignments were turned in, albeit late.

Outside of school, Kendra is involved in gymnastics and would be able to continue this activity in New Mexico if she chose to do so.

Although it appears the emotional, physical, and developmental needs may be met at a baseline level with either parent, the evidence indicates Melanie has been a more stable and constant presence and would meet Kendra's emotional, physical, and developmental needs more effectively.

For these reasons, we determine this factor weighs in favor of removal.

### (ii) Child's Opinion or Preference

Kendra did not testify, and this factor was not used to weigh in favor of or against removal.

### (iii) Enhancement of Custodial
### Parent's Income

It is clear that the move to New Mexico will enhance Melanie's income. Prior to graduating from the nursing program, she was a stay-at-home mother, and during her schooling, she received only a stipend for living expenses. The job in New Mexico provides Melanie with a salary, health insurance, a retirement plan, life insurance, and long-term advancement training opportunities. She testified she will be trained as a charge nurse and will be eligible for promotions. If she maintains the position for 2 years, she will not be required to pay back the money she received as part of her scholarship and will be eligible for loan repayment. We agree with the district court's determination that this factor weighs in favor of removal.

### (iv) Degree to Which Housing
### or Living Conditions
### Would Be Improved

The district court determined this factor did not support removal, because Melanie "has the burden to prove that the minor child's housing *shall be improved* by relocating to New Mexico and failed to meet that burden." (Emphasis supplied.) By saying Melanie has the burden of showing how housing "shall be improved," the trial court imposes a burden requiring a heightened level of proof that we have not previously required.

A parent requesting removal must show how the child's quality of life will be improved, and each of the factors listed in *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007), and other such removal cases contribute to the court's ultimate determination regarding the child's best interests. Improvement in housing or living conditions is merely one factor the court may consider when determining whether the quality of life will be impacted.

[11] In previous cases, where the evidence does not establish any significant improvement in housing or living conditions, we have determined that the factor does not weigh in favor of or against removal. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012).

In Omaha, Melanie and her husband lived in a four-bedroom home and Kendra shared a room with her half sister. In New Mexico, Melanie and her husband leased a three-bedroom home and Kendra would continue to share a room with her half sister. Melanie testified that the room in Gallup would be larger than the room in Omaha. Melanie also testified that Kendra's school is one block away from their home and that she had no concerns about the size of the home or the safety of the neighborhood. She said the neighborhood is comparable to their neighborhood in Omaha.

We find the living conditions in Omaha and Gallup are comparable, and this factor does not weigh in favor of or against removal.

### (v) Existence of Educational Advantages

Another factor to consider is whether New Mexico offers educational advantages. The trial court stated Melanie had the "burden to prove that the minor child's schooling *shall be improved* by relocating to New Mexico and failed to meet that burden." (Emphasis supplied.) Again, the trial court imposes a burden requiring a heightened level of proof that we have not previously required.

[12] We have held this factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

Melanie testified that if allowed to move, Kendra would attend an elementary school in Gallup and would be able to start immediately. Neither party provided evidence that one school is superior to the other. Therefore, we find this factor does not weigh in favor of or against removal.

### (vi) Quality of Relationship Between Child and Each Parent

It appears Kendra has a good relationship with both parties. Both parties testified that Melanie was the primary caregiver during their marriage and that she continued to fill that role after the parties' divorce. If Melanie were given permission

to remove Kendra, she would not have weekly visitation with Christopher. However, Melanie testified she would return to Omaha with Kendra often to visit extended family and would allow Kendra to spend the majority of the time in Omaha with Christopher. Additionally, Melanie's proposed parenting-time plan allowed for parenting time over school vacations and holidays and extended time in the summer.

The evidence shows Kendra has a good relationship with both parents. Christopher testified that he has maintained a close relationship with Kendra and that he spends time with her on the weekends camping, fishing, riding bikes, and doing art projects.

The district court considered the evidence and determined Christopher's relationship with Kendra would be negatively affected by the move, because it would affect his weeknight and weekend parenting time. The court determined this factor weighed strongly against removal.

[13] The effect of the removal of a child to another jurisdiction must be evaluated in light of the child's relationship with each parent. *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005).

The district court did not consider the quality of the relationship between Kendra and *each* parent, because there is no mention or consideration of Kendra's relationship with her mother. The evidence is clear that Kendra has a strong bond with Melanie as well. Under the established visitation schedule, Kendra spent two evenings with Christopher per week and had overnights every other weekend. The remaining time was spent with Melanie. Melanie was involved in Kendra's daily routine, helped with homework, and cared for her emotionally and physically. They enjoy going to the park, watching movies, and participating in Native American ceremonies with Melanie's extended family. After Melanie's move, she and Kendra talked on the telephone every day and have had regular e-mail and "Skype" contact, but this is clearly not the same quality of relationship they enjoyed prior to the move.

We find Kendra's strong bond with Melanie, coupled with Melanie's willingness to help Kendra maintain a strong bond with Christopher, weighs in favor of allowing removal.

### (vii) Strength of Child's Ties to
### Present Community and
### Extended Family

The district court determined this factor weighs strongly against removal of Kendra, because all of her extended family resides in Nebraska, including both her mother's and her father's families. The district court also gave credit to Christopher for allowing Kendra to continue seeing her extended family on Melanie's side after Melanie moved.

The evidence shows that although Christopher continued to allow Kendra to see Kendra's maternal grandparents, they testified that the visits are becoming shorter and less frequent.

The district court correctly determined that Kendra has strong ties to family members residing in Omaha, including Christopher's father, grandparents, and aunts and uncles; Christopher, his fiance, and their 1-year-old daughter; and Melanie's extended family. There are also multiple members of Christopher's family, including his mother and brothers, with whom he has no contact. We also must consider the relationship between Kendra and her stepfather and her half siblings, with whom she resided for many years. Additionally, we consider the testimony of Melanie's parents that they would visit New Mexico approximately six times per year and that they would enjoy visits with Kendra whenever she returned to Nebraska to see Christopher and his family. Upon our review, we find Kendra has relationships with individuals in both New Mexico and Nebraska, and this factor weighs only slightly against removal.

### (viii) Likelihood That Allowing or
### Denying Move Would Antagonize
### Hostilities Between Parties

We find that either granting or denying removal has the potential to antagonize hostilities between the parties, so we do not find this factor weighs in favor of or against removal.

### (ix) Conclusion Regarding
### Quality of Life

After considering all of the quality-of-life factors, we conclude upon our de novo review that Melanie established

removal would enhance the quality of life for Kendra and for herself.

### (c) Impact on Noncustodial Parent's Visitation

Relocating to New Mexico will undoubtedly have an effect on the time Kendra spends with Christopher. Christopher would no longer have the ability to exercise his parenting time two evenings per week and every other weekend.

Melanie recognized the impact this change would have on the relationship between Kendra and Christopher and proposed changes to the parenting plan to include extended time with Christopher during holidays, school breaks, and summer vacation. Melanie's "Suggestions to the Court" prior to trial proposed maintaining joint legal custody and making Melanie's possession subject to Christopher's liberal parenting time. She proposed allowing Christopher up to 8 weeks of summer parenting time and suggested Christopher be entitled to spring break and half of the Christmas holiday every year. She recognized that schedules would be subject to travel issues and said she would take that into account when scheduling and exercising parenting time.

Melanie also stated she would return to Nebraska frequently to visit her family and would allow Kendra to stay with Christopher for the majority of that time. Melanie's suggestions to the court proposed splitting the travel expenses on behalf of Kendra equally, but stated at trial that she would pay for the majority of Kendra's travel expenses or accept a reduction in child support if Christopher paid for transportation. Christopher and Kendra could stay in contact during the time between visits via telephone calls, e-mails, and "Skype" calls.

[14,15] Nebraska courts have recognized that a noncustodial parent's visitation rights are important, but a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason. See *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986). Rather, we focus on the ability of the noncustodial parent to maintain a meaningful parent-child relationship, and such relationship is possible even

if Kendra moves to New Mexico. See *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

This factor weighs slightly against removal, because it will reduce the amount of in-person weekly contact Kendra has with Christopher, but removal would still allow Kendra and Christopher to maintain a meaningful relationship.

### (d) Conclusion on Best Interests

A de novo review of the evidence shows that the parents were not motivated by an effort to frustrate the relationship of their child with the other parent, that the move would enhance Kendra's quality of life, and that it would not greatly impact the relationship between Kendra and Christopher. The record demonstrates sufficient evidence that it is in Kendra's best interests to move from Nebraska to New Mexico.

### (e) Custody

Custody in this case would not be at issue were it not for Melanie's decision to move to New Mexico to pursue a job opportunity. The district court stated that "but for [Melanie's] making a voluntary financial decision to stay in New Mexico, she would retain custody." The parties agree Melanie was the primary caregiver, and there is no indication that Christopher intended to gain custody if Melanie had stayed in Omaha with Kendra. In fact, Christopher did not initially seek custody in his complaint in April 2012; rather, he sought an injunction preventing Melanie from removing Kendra from the State of Nebraska.

The first indication that Christopher was willing to assume care, custody, or control of Kendra was included in his reply and answer to Melanie's answer and cross-complaint to modify in June 2012. The reply and answer affirmatively alleged that "it is in the best interests of the parties' minor child that should [Melanie] leave the State of Nebraska that the care, custody and control of the minor child be with [Christopher]." While he mentions custody in such pleading, he did not file a counterclaim seeking custody or allege there had been a material change of circumstances warranting a change of custody.

We determined above that Melanie had a legitimate reason to leave the State of Nebraska and provided sufficient evidence that removal was in Kendra's best interests. Therefore, we reverse the trial court's custody determination and reinstate the custody determination set forth in the decree.

## VI. CONCLUSION

We conclude the district court abused its discretion in determining that Melanie's acceptance of a job in New Mexico did not constitute a legitimate reason to leave the state. Upon our de novo review and after consideration of various relevant factors, we find that removing Kendra to New Mexico is in her best interests. Accordingly, we reverse the court's order denying Melanie's complaint to modify and the court's modification of custody. We order legal custody of Kendra to be held jointly by the parties and order physical custody be restored to Melanie. We remand for further proceedings consistent with our opinion.

Reversed and remanded for further proceedings.