Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/17/2017 09:08 AM CST

Jason Boyer, appellant, v.
Lauren Boyer, appellee.
___ N.W.2d ___

Filed January 17, 2017.    No. A-16-150.

1. **Child Custody: Visitation: Appeal and Error.** Child custody and
   visitation determinations are matters initially entrusted to the discretion
   of the trial court, and although reviewed de novo on the record, the
   trial court's determination will normally be affirmed absent an abuse
   of discretion.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when
   a judge, within the effective limits of authorized judicial power, elects
   to act or refrains from acting, and the selected option results in a deci-
   sion which is untenable and unfairly deprives a litigant of a substantial
   right or a just result in matters submitted for disposition through a judi-
   cial system.
3. **Child Custody.** In order to prevail on a motion to remove a minor child
   to another jurisdiction, the custodial parent must first satisfy the court
   that he or she has a legitimate reason for leaving the state. After clearing
   that threshold, the custodial parent must next demonstrate that it is in the
   child's best interests to continue living with him or her.
4. ____. Remarriage is a commonly found legitimate reason for removal of
   a child from the state.
5. ____. Absent evidence of an ulterior motive, a custodial parent's desire
   to live with his or her current spouse, who is located outside of the cus-
   todial jurisdiction, is a legitimate reason to remove the minor child.
6. **Appeal and Error.** An appellate court is not obligated to engage in an
   analysis that is not necessary to adjudicate the case and controversy
   before it.
7. **Child Custody: Visitation.** In determining whether removal to another
   jurisdiction is in the child's best interests, the court considers (1) each
   parent's motives for seeking or opposing the move; (2) the potential
   the move holds for enhancing the quality of life for the child and the
   custodial parent; and (3) the impact such move will have on contact

between the child and the noncustodial parent, when viewed in the light of reasonable visitation.

8. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party.

9. ____. In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent.

10. ____. The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted.

11. ____. The existence of educational advantages factor receives little or no weight when the custodial parent fails to prove that the new schools are superior.

12. **Child Custody: Visitation.** A noncustodial parent's visitation rights are important, but a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason.

13. **Child Custody.** In considering removal of a child to another jurisdiction, a court focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship.

Appeal from the District Court for Sarpy County: DAVID K. ARTERBURN, Judge. Affirmed.

Aimee S. Melton and A. Bree Robbins, of Reagan, Melton & Delaney, L.L.P., for appellant.

Robin L. Binning, of Binning & Plambeck, for appellee.

Moore, Chief Judge, and Pirtle, Judge, and McCormack, Retired Justice.

Pirtle, Judge.

## I. INTRODUCTION

Jason Boyer appeals from an order of the district court for Sarpy County which granted Lauren Boyer's request to remove the parties' minor child from Nebraska to Alaska. We find that Lauren had a legitimate reason to request removal and find, upon our de novo review, that she sufficiently demonstrated removal would be in the child's best interests. Accordingly, we affirm the district court's order.

## II. BACKGROUND

The parties met in Montana in 2004. Jason was a member of the U.S. Air Force at the time. The parties married in November 2006 in Nebraska, and they had one child together, Micah Boyer, who was born in 2010. During their relationship, they moved frequently due to Jason's military service. The parties separated around February 2011. At that time, they were living in California. Following the separation, Lauren and Micah moved to Bellevue, Nebraska, where Lauren's parents were living due to her father's military service.

Jason filed for divorce in California, and a divorce decree was entered on April 25, 2013. Lauren was awarded physical custody of Micah, and the parties were awarded joint legal custody. Lauren was allowed to stay in Nebraska with Micah. Jason continued to live in California due to his military service until he was honorably discharged in August 2014. He moved to Nebraska in September 2014 to be closer to Micah.

Between February 2011 and September 2014, Jason made multiple trips to Nebraska to visit Micah. Jason also maintained contact with Micah through telephone and "Skype" conversations. Upon moving to Nebraska, Jason began spending time with Micah on a frequent basis.

After moving to Nebraska, Jason enrolled in a bachelor's degree program, which he completed, and he also worked

part time. At the time of trial in January 2016, he had been accepted into a master's degree program in security management that was set to start the month after trial.

When Lauren first moved to Nebraska with Micah, they lived with Lauren's parents for about 6 months and then moved into a two-bedroom apartment. At the time of trial, they were living with Lauren's parents again, because Lauren had given up her apartment in anticipation of her move out of state.

After moving to Nebraska, Lauren went to nursing school, and in August 2014, she became a licensed practical nurse (LPN). She was employed as a nursing supervisor at a long-term care facility, where she had worked various shifts.

In the summer of 2014, Lauren met her current husband, Collin Stone, on a dating Web site. They began communicating with each other by telephone and e-mail, and she learned early on that Collin lived in Alaska. After about a year of communicating with him, Collin came to Nebraska in June 2015, and she met him in person for the first time. Micah met Collin as well. Lauren and Collin next saw each other in July, when they met each other in Montana. Micah was not present on this trip. During this visit, Lauren and Collin became engaged. They were married in August, after Jason filed this action. Lauren had never been to Alaska until August or September, after her marriage to Collin. The first time Micah went to Alaska was for Christmas. At trial, Lauren testified that three home pregnancy tests had indicated she was pregnant, although she had not yet been to a doctor.

On August 5, 2015, Jason filed an application to register the parties' California dissolution order in Nebraska. He also filed a complaint for modification alleging that material changes in circumstances had occurred that warranted a modification to the decree. The alleged changes were that Jason had moved to Nebraska to be closer to Micah; that the parties mediated a parenting plan, and Jason had been actively involved in Micah's life; that Lauren told Jason that she was getting married, moving to Alaska, and taking Micah with her; that such move would substantially impact Jason's relationship with

Micah; and that the move to Alaska is contrary to Micah's best interests. He requested that the decree be modified to order Lauren to stay in Nebraska with Micah or, in the alternative, to order that Micah stay in Nebraska. If Lauren chooses to leave Nebraska, Jason asked that custody be awarded to him. Jason also requested an increase in the amount of his visitations previously ordered.

Lauren filed an answer and counterclaim on August 13, 2015. In her counterclaim, she alleged that material changes in circumstances had occurred to warrant modification of the decree, in that joint legal custody was no longer in Micah's best interests, that Lauren is remarried and plans to relocate to Alaska, that it was in Micah's best interests to grant Lauren permission to remove Micah from Nebraska, and that Lauren has been responsible for providing the daily care and the financial support for Micah since the decree was entered. Lauren requested that the court award her legal and physical custody of Micah, subject to reasonable parenting time by Jason, and grant her permission to remove Micah from Nebraska to Alaska.

Following trial on Jason's complaint for modification and Lauren's counterclaim for modification, the trial court found that Lauren had met her burden of proof as to removal and granted her permission to remove Micah from Nebraska to Alaska.

## III. ASSIGNMENTS OF ERROR

Jason assigns that the trial court erred in (1) finding that Lauren had a legitimate reason to remove Micah from Nebraska to Alaska, (2) finding that removal was in Micah's best interests, (3) receiving exhibit 39 into evidence, and (4) finding that the parties shall share joint legal custody of Micah effective January 1, 2018.

## IV. STANDARD OF REVIEW

[1,2] Child custody and visitation determinations are matters initially entrusted to the discretion of the trial court, and

although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.*

## V. ANALYSIS

[3] Jason's first two assignments of error relate to the trial court's granting Lauren permission to remove Micah from Nebraska to Alaska. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Dragon v. Dragon, supra.*

### 1. Legitimate Reason for Leaving State

[4,5] The trial court found that Lauren's remarriage and subsequent pregnancy constituted legitimate reasons to leave the state. It is well established in Nebraska case law that remarriage is a commonly found legitimate reason for removal of a child from the state. See, *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002); *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Curtis v. Curtis*, 17 Neb. App. 230, 759 N.W.2d 269 (2008). Our precedent has recognized that absent evidence of an ulterior motive, a custodial parent's desire to live with his or her current spouse, who is located outside of the custodial jurisdiction, is a legitimate reason to remove the minor child. *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014).

Jason argues that the facts in this case are distinguishable from the facts in prior cases where marriage has been found to be a legitimate reason for removal. He contends that in cases such as *Vogel v. Vogel, supra*, and *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002), the parties met their spouses in Nebraska and sought removal after the new spouse needed to relocate for career reasons, which is not the situation here. Lauren and Collin did not meet in Nebraska, and removal is not being sought for a career reason of Collin's. Jason also argues that because Lauren met her current husband online and did not meet him in person until a few months before their marriage, her marriage is somehow less credible than that of a couple meeting by other means. As the trial court found, there is no basis in the case law to treat this marriage differently than those found in other cases. We conclude that Lauren's marriage to Collin was a legitimate reason for removal.

[6] Having concluded that Lauren's remarriage was a legitimate reason for removal, we need not determine whether her pregnancy was also a legitimate reason. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Doty v. West Gate Bank*, 292 Neb. 787, 874 N.W.2d 839 (2016).

## 2. Best Interests

Having determined Lauren met the threshold requirement, we will consider upon our de novo review whether she demonstrated that removing Micah from Nebraska is in his best interests. See *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013).

[7] In determining whether removal to another jurisdiction is in the child's best interests, the court considers (1) each parent's motives for seeking or opposing the move; (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation. *Id.*

### (a) Each Parent's Motives

[8] The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party. *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007).

The evidence shows Lauren sought removal because she wants to live with her new husband, who has lived in Alaska for 20 years; who teaches aviation in high school, which is not something he can easily teach anywhere else; and who has shared custody of his three children in Alaska. We note the trial court's concern about the future stability of this marriage, given that Lauren and her new husband have not spent significant time together. Nevertheless, we agree that her motivation in seeking removal appears to be sincere and not an effort to frustrate or manipulate Jason.

Jason's motives for resisting the removal are also sincere. He opposes removal because it would dramatically affect his parenting time and his relationship with Micah. When Jason was discharged from the Air Force, he moved to Nebraska to be close to Micah. Since his move in September 2014, Jason has been spending time with Micah on a regular basis and has been working on establishing a good relationship with him. There is no indication that his opposition to removal is an attempt to frustrate or manipulate Lauren.

Both parties have sincere motives for seeking or opposing removal and neither party acted in bad faith. This factor does not weigh for or against removal.

### (b) Quality of Life

[9] In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to

which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. See, *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000); *Wild v. Wild, supra*.

[10] This list should not be misconstrued as setting out a hierarchy of considerations, and depending on the circumstances of a particular case, any one consideration or combination of considerations may be variously weighted. *Wild v. Wild, supra*.

### (i) Emotional, Physical, and Developmental Needs

We first consider the impact on Micah's emotional, physical, and developmental needs in assessing the extent to which the move could enhance the child's life.

The evidence shows that Lauren has always been Micah's primary caregiver and, thus, has been the parent responsible for his emotional, physical, and developmental needs. Lauren testified that when Micah was an infant, she was the one primarily responsible for his care and he was with her all the time. During the marriage, Jason often worked very long hours as a result of his military duties. When Lauren and Micah moved to Nebraska, Lauren was Micah's primary parent and was responsible for his daily needs. The evidence demonstrates that Micah's emotional, physical, and developmental needs have always been met.

Since Jason moved to Nebraska, he and Micah have been spending time together regularly and Jason has been taking on more responsibility in meeting Micah's emotional, physical, and developmental needs. However, Lauren has a more stable

and constant presence in Micah's life and has been the one historically responsible for his emotional, physical, and developmental needs. We agree with the trial court that this factor weighs somewhat in favor of removal.

### (ii) Child's Opinion or Preference

Micah did not testify and was too young, at the age of 5, to state his preference on where to live. This factor does not weigh in favor of or against removal.

### (iii) Enhancement of Custodial Parent's Income

Lauren claims that the move to Alaska will enhance her income. At the time of trial, she was working as an LPN in a long-term care facility and earning $18 per hour. She testified that she believed that her current income reflected the maximum income she could earn as an LPN in the Omaha, Nebraska, area. She testified that she had not applied anywhere besides the place she works, because the starting pay at other LPN jobs would be lower than what she makes. However, she had no corroborating evidence to support her opinions.

Lauren testified that she had been offered a job with the school district in Nenana, Alaska. She testified that she was offered a position as a school nurse, which the school currently does not have. She stated that she would be paid $25 per hour and that her work hours would be the same hours as Micah's schoolday. She also testified that she would be working at the same school Micah would be attending. Lauren testified that the job was an opportunity that she would not have in Nebraska, because there are a lot of nurses in Nebraska.

Lauren testified that she had received a written confirmation of the job offer from the Nenana school district. Exhibit 39 is the purported job offer from the superintendent of the school district, which exhibit was admitted into evidence, over Jason's objection.

Jason assigns that the trial court erred in receiving exhibit 39 into evidence. He objected to the admission of the exhibit

into evidence based on the grounds of hearsay and foundation. Lauren's counsel stated she was not offering the exhibit for the truth of the matter asserted in the exhibit, but for confirmation that Lauren received an offer from the Nenana school district. The court overruled Jason's objection and received the exhibit for the limited purpose as offered.

Assuming without deciding that the trial court erred in admitting exhibit 39 into evidence, it was harmless error because the exhibit failed to provide any evidence that Lauren has a job in Alaska. The "offer" that was made to Lauren, as set forth in exhibit 39, was to do "an assessment of the medical practices and procedures utilized at the Nenana Student Living Center and throughout the Nenana City School." The assessment was expected to take 1 month, and during that time, Lauren would be paid $25 an hour. Exhibit 39 further states that once the assessment is complete, the school district would then decide, based on the results, whether it would offer Lauren a permanent position to provide nursing services. A permanent position would provide "competitive wages"; a fully paid medical, dental, and vision plan; and "participation in Alaska's Public Employees Retirement System."

Therefore, exhibit 39 shows only that the school district will allow Lauren to do an assessment to see if there is a need for a new position. She had not been offered a permanent position, only the possibility of one. Further, even if we could construe exhibit 39 as a job offer, there is nothing to indicate that her income will be enhanced. She will be paid $25 per hour during the assessment, but in regard to a permanent position, we know only that she will be paid "competitive wages." There is no indication as to what that means or any evidence as to what LPN's are paid on average in Alaska. In addition, Lauren failed to provide any evidence regarding the cost of living in Nenana versus Bellevue. Any potential increase in her earnings could be spent on cost-of-living increases. See *Wild v. Wild*, 13 Neb. App. 495, 696 N.W.2d 886 (2005). Finally, we note that Lauren also testified that she always wanted to be a stay-at-home

mother and that she could do that if she wanted by moving to Alaska, which contradicts any evidence about an enhancement in her income.

We conclude that there is no evidence that Lauren's income will be enhanced by a move to Alaska. Accordingly, this factor does not weigh in favor of removal.

### (iv) Degree to Which Housing or Living Conditions Would Be Improved

At the time of trial, Lauren and Micah were living with Lauren's parents in their home. Prior to making plans to move to Alaska, Lauren and Micah lived in a two-bedroom apartment. Lauren testified that if she stayed in Nebraska with Micah, she would find another two-bedroom apartment to live in. Jason also lives in a two-bedroom apartment. If removal were allowed, Lauren and Micah would live in a three-bedroom house that Collin owns. There was testimony that a loft area of the house could be used as an additional bedroom. The house is located on a 1-acre lot in a wooded area just outside Nenana, which is a small town of about 500 people. The closest city is Fairbanks, Alaska, which is about a 40-minute drive.

We conclude that housing or living conditions would be somewhat improved by the move to Alaska. Accordingly, this factor weighs in favor of removal.

### (v) Existence of Educational Advantages

[11] We next consider whether Alaska offers educational advantages. We have held this factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008).

At the time of trial, Micah was attending school in the Bellevue public school system. In Alaska, he would attend school in the Nenana public school system. There was no evidence presented that one school district would provide educational advantages over the other. Lauren testified that she

believed both school systems would provide a good education and that the education factor was neutral. Therefore, we find this factor does not weigh in favor of or against removal.

### (vi) Quality of Relationship Between
### Child and Each Parent

The evidence showed that Micah has a good and loving relationship with both parents. There was no real bond established between Jason and Micah when Micah was a baby, because Jason often worked long hours and Lauren and Micah moved to Nebraska when Micah was less than a year old. The relationship between Jason and Micah has gotten stronger since Jason's move to Nebraska. They have grown closer since then, and they spend time with each other on a regular basis. As the trial court noted, Jason has made a sincere effort to build a strong relationship with Micah since he moved to Nebraska. Lauren testified that Micah has a lot of fun with Jason and that they do activities and go places when they are together. She was concerned, however, that Jason does not discipline Micah and that they are more "buddies" than father and son.

Lauren has been Micah's primary caregiver all of his life, and they have a strong bond. As the court noted, if Micah had to be separated from one or the other parent, he would more easily adapt to not seeing Jason on a frequent basis, given his close bond to Lauren.

Although the evidence shows that Jason has a good relationship with Micah, the relationship between Lauren and Micah is stronger and well-established. Therefore, we conclude that Micah's strong bond with Lauren weighs in favor of removal.

### (vii) Strength of Child's Ties to Present
### Community and Extended Family

Micah was only 5 years old at the time of trial, so he does not have any strong ties to the Bellevue community. He does, however, have strong ties to Lauren's extended family who

live in the Bellevue area. Lauren's parents and several of her siblings live in Bellevue. Lauren and Micah lived with Lauren's parents when they first moved to Nebraska and lived with them again after Lauren planned to move to Alaska. Lauren's parents have also been Micah's childcare providers when Lauren is working.

Lauren's father, however, testified that he and his wife may move out of Nebraska at some point because he would like to pursue other career opportunities. Lauren's father was in the Air Force and was stationed in Nebraska in 2006. He retired in 2009 and has stayed in Nebraska since then, working at the Air Force base as a civilian employee. He testified that he and his wife would consider moving out of Nebraska for a career opportunity, but not until after his daughter finished her cosmetology school education in the next 18 months. He had previously turned down job offers outside of Nebraska because the timing was not right. He testified that if he and his wife moved, he did not know whether his two adult children that live in Bellevue would also move or remain in Nebraska.

Jason has no ties to Nebraska and no family in the state. Neither Jason nor Lauren have any family in Alaska. We conclude that this factor does not weigh in favor of or against removal.

### (viii) Likelihood That Allowing or Denying Move Would Antagonize Hostilities Between Parties

The evidence shows that there is hostility between the parties, primarily as a result of Lauren's desire to move to Alaska. Prior to Lauren's remarriage and desire to move, the parties were able to communicate with each other about Micah. There has been some contentious communication between the parties in the past, primarily caused by Jason.

Any decision in this situation has the potential to antagonize the hostilities between the parties, at least for a period of time. Lauren could be hostile toward Jason if she is not allowed to move to Alaska with her new husband and the father of the

child she is pregnant with. Likewise, Jason may be hostile if Lauren is allowed to take Micah to Alaska, after he moved from California to Nebraska to be near Micah. Therefore, this factor does not weigh in favor of or against removal.

### (ix) Living Conditions and Employment
### Opportunities of Custodial Parent

This factor is repetitive of other facts already discussed. We concluded that the living conditions in Alaska would somewhat improve and that Lauren's income or employment opportunities would not necessarily improve. We give no weight to this factor as it is incorporated into other factors.

### (x) Conclusion Regarding
### Quality of Life

After considering all of the quality-of-life factors, we conclude upon our de novo review of the record that Lauren established removal would enhance the quality of life for Micah.

### (c) Impact on Noncustodial
### Parent's Visitation

Relocating to Alaska will undoubtedly have a significant impact on Jason's visitation time. Since moving to Nebraska, Jason has been spending time with Micah on a regular basis and has become very involved in his life. If Lauren is allowed to move to Alaska with Micah, given the distance involved, Jason will no longer see Micah on a regular basis and is mostly likely to see him only a few times per year. The new parenting plan provides for Jason to have Micah in Nebraska for 7 weeks during the summer vacation and approximately 1 week during the Christmas vacation, with transportation paid for by Lauren. Jason also has the option to exercise parenting time during spring break, at his cost, and to have three 1-week visits in Alaska. The majority of Jason's contact with Micah would be by telephone or Skype, which cannot replace the frequent, in-person contact he currently has and would continue to have if Micah were to remain in Nebraska.

[12,13] Nebraska courts have recognized that a noncustodial parent's visitation rights are important, but a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013), citing *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986). Rather, we focus on the ability of the noncustodial parent to maintain a meaningful parent-child relationship. *Dragon v. Dragon, supra*, citing *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). A meaningful relationship would be difficult, if not impossible, if Lauren moves to Alaska.

This factor weighs against removal because the move will dramatically reduce the amount of in-person contact Jason has with Micah and it would be difficult to maintain a meaningful relationship.

### (d) Conclusion on Best Interests

A de novo review of the evidence shows that the parents were not motivated by an effort to frustrate the relationship of their child with the other parent and that the move would enhance Micah's quality of life. Although the move would greatly impact the relationship between Jason and Micah, the record overall demonstrates that it is in Micah's best interests to move with Lauren from Nebraska to Alaska.

### (e) Conclusion on Removal

Based on the totality of the record, we conclude that the trial court did not err in finding that Lauren has a legitimate reason for leaving the state and that it is in Micah's best interests to continue living with Lauren. Accordingly, we affirm the court's order granting Lauren permission to move with Micah to Alaska.

### 3. Legal Custody

Finally, Jason assigns that the trial court "erred in finding that the parties shall share joint legal custody of Micah effective January 1, 2018." Brief for appellant at 28. Jason

contends that the court ordered that Lauren would have sole legal custody until January 1, 2018, at which time he and Lauren would have joint legal custody of Micah as originally set forth in the decree. He argues there was no reason for such an order.

The court found that communication between the parties had become strained and that joint decisionmaking had become more difficult, but was likely to improve in the future. As a result, it held:

> [T]he Court finds that the parties shall continue to have joint legal custody of their minor child. However, due to the current level of animosity and difficulty of communication, the Court finds that final decision-making authority on all major decisions involving the minor child shall be granted to [Lauren] through December 31, 2017. Effective January 1, 2018, the parties shall resume joint legal custody as outlined in the decree of dissolution. During the interim period, [Lauren] shall discuss all major decisions regarding the child's well being with [Jason] and seek to reach consensus with [him] regarding said decisions. She shall only exert her final decision-making authority in the event that a complete impasse exists between the parties. No major decision shall be made without consultation with [Jason].

We conclude that the court did not temporarily change joint legal custody, as Jason contends. Rather, the court ordered that the parties would continue to have joint legal custody of Micah, but it gave Lauren temporary final decisionmaking authority on all major decisions until December 31, 2017. We find no merit to Jason's final assignment of error and further conclude that the trial court did not abuse its discretion in giving Lauren temporary final decisionmaking authority.

## VI. CONCLUSION

We conclude the district court did not abuse its discretion in determining that Lauren's marriage to Collin constituted a legitimate reason to leave the state and that it was in Micah's

best interests to continue living with Lauren in Alaska. We further conclude that the district court did not err in giving Lauren final decisionmaking authority until December 31, 2017. Accordingly, the district court's opinion and order of modification is affirmed in its entirety.

AFFIRMED.

MOORE, Chief Judge, concurring.

I write separately to express my discomfort with the district court's grant of Lauren's application to remove Micah from Nebraska. While I have no complaint with the finding that Lauren established a legitimate reason to move from Nebraska, I am troubled by the finding that the move would be in Micah's best interests. The facts that, in my mind, weigh against granting the removal are as follows: (1) Jason's move from California to Nebraska to be close to Micah; (2) the significant distance between Nebraska and Alaska, with the corresponding travel limitations; and (3) the relatively weak evidence that Micah's quality of life would be enhanced in Alaska. The strongest argument against removal, though, is the negative impact that the move will have on the relationship between Jason and Micah, a relationship that has grown substantially stronger since Jason moved to Nebraska. The parenting plan, while granting Jason visitation in Nebraska during part of the Christmas and summer vacations, does not adequately substitute for the more regular interaction that Jason and Micah have grown accustomed to in Nebraska. In addition, at the time of trial, Micah had not had an opportunity to establish a meaningful relationship with his stepfather, Collin; they had only met on one occasion before the marriage and only two or three times before the trial. Thus, Micah is moving far away from his stable home in Nebraska, where his father, grandparents, and aunts and uncles reside, to a home in Alaska where he is largely unfamiliar with his new blended family.

Nevertheless, I ultimately agree that our standard of review in custody and removal cases dictates that we affirm the trial

court's decision in this case. The Nebraska Supreme Court
has recognized:

> In parental relocation cases, trial and appellate courts
> deal with the tension created by a mobile society and the
> problems associated with uprooting children from stable
> environments. Courts are required to balance the noncus-
> todial parent's desire to maintain their current involve-
> ment in the child's life with the custodial parent's chance
> to embark on a new or better life. These issues are among
> the most difficult issues that courts face in postdivorce
> proceedings. It is for this reason that such determina-
> tions are matters initially entrusted to the discretion of
> the trial judge, and the trial judge's determination is to be
> given deference.

*Steffy v. Steffy*, 287 Neb. 529, 537, 843 N.W.2d 655, 662-63
(2014). See, also, *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d
865 (2015).

After giving appropriate deference to the discretion of the
trial judge, who observed the demeanor of the witnesses, I am
unable to find that the decision was so untenable as to rise
to the level of an abuse of that discretion. Thus, I join in the
majority's opinion affirming the trial court's decision.