Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/07/2016 12:09 PM CDT

ANGELA M. HILLER, APPELLEE, V.
COREY A. HILLER, APPELLANT.
___ N.W.2d ___

Filed March 15, 2016.    No. A-15-140.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters entrusted for disposition through a judicial system.

3. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Child Custody: Proof.** There is a two-step process before a custodial parent is allowed to remove a child from the State of Nebraska. The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent.

5. **Child Custody.** Removal jurisprudence has been applied most frequently when a custodial parent requests permission to remove a child from the state and custody has already been established. However, the Nebraska Supreme Court has used the factors considered in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), when determining whether removal is appropriate in an initial custody determination.

6. **Child Custody: Proof.** To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state.

7. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

8. **Child Custody: Visitation.** In determining whether removal to another jurisdiction is in the children's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent, and (3) the impact such a move will have on contact between the children and the noncustodial parent.

9. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party.

10. ____. In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the children and the custodial parent, a court should evaluate the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the parties; and (9) the living conditions and employment opportunities for the custodial parent.

11. **Child Custody: Visitation.** A reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason.

Appeal from the District Court for Otoe County: JEFFREY J. FUNKE, Judge. Affirmed.

Terrance A. Poppe and Andrew K. Joyce, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Jenny L. Panko, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee.

Pirtle, Riedmann, and Bishop, Judges.

Pirtle, Judge.

## I. INTRODUCTION

Corey A. Hiller appeals from the order of the district court for Otoe County entered on January 15, 2015. The order dissolved his marriage to Angela M. Hiller and awarded the parties joint legal custody of their two minor children. The court awarded Angela physical custody of the children and granted her permission to remove the children from Nebraska to Virginia. For the reasons that follow, we affirm.

## II. BACKGROUND

Corey and Angela married in August 1997 and separated in June 2014. The parties have twin daughters, Brooke Hiller and Hannah Hiller, who were born in 2001. Shortly after the parties separated, they began alternating time in the family home with the children, with each party spending certain days and nights in the home.

Angela filed a complaint for dissolution of the parties' marriage in the district court for Otoe County in August 2014. The complaint requested dissolution, custody of the children, and permission to remove the children from the State of Nebraska. Angela had an offer of employment at the Department of Veterans Affairs (VA) in Washington, D.C., and planned to move to Sterling, Virginia, with the children. She stated the move was in the children's best interests and was "being made for legitimate purposes regarding [Angela's] employment." In November, Corey filed a response, as well as a "cross complaint," in which he also requested custody of the parties' children.

The matter was tried before the district court on November 12 and 21 and December 19, 2014. Angela testified that she was the primary caretaker, seeing to the children's daily needs, including cooking, cleaning, laundry, grocery shopping, assisting with homework, and purchasing clothing, school supplies, and personal care items. She also testified that she took care

of the children's medical and dental needs, maintained their schedule of extracurricular activities, and attended their sporting events.

Angela testified that in the time that Corey resided in the home with the children, he failed to keep the house clean, failed to shop for or provide nutritious food for the children, and could not assist with the children's homework at the level that was required. She testified that he lacked organizational skills, he did not maintain the children's schedules, and he did not assist them in getting ready for activities. She testified that after they began alternating time in the family home, she routinely returned to the home after Corey stayed there to find dirty and clean laundry commingled and covered in pet hair, dried dog urine on the floor, dirty dishes in the sink, dirty pots sitting on the stove, and unclean bathrooms. Angela and her mother, Judy Moritz, testified that they spent hours cleaning the home after Corey spent time there. Angela testified that she began stocking the refrigerator with fresh fruits and vegetables for the children to eat during the days when Corey stayed with them because he did not always make healthy food purchases for the children.

Angela testified that Corey displayed carelessness with firearm safety in the home. She presented evidence that firearms and ammunition were left unsecured in the home despite her requests that they be placed in a gun safe. She said that in September 2014, Brooke retrieved an unsecured gun from a closet in the home and took it outside to shoot. Corey testified that he did leave firearms outside of the parties' gun safes and acknowledged that it was possible that the children's friends, some of whom may not be well trained in firearm safety, could be in the home.

Angela testified that she holds a bachelor's degree in English and had worked for the VA in Lincoln, Nebraska, for 14 years. Her job title at the VA in Lincoln was "Rating Quality Review Specialist." Her duties included performing quality review of other employees' work and giving feedback

to management, who made personnel decisions based on error rates. She also was responsible for mentoring those individuals she reviewed and for conducting training related to the federal regulations governing disability benefits to veterans for injuries incurred during service. She testified that she had looked for positions outside of the VA at times, but found that the skills she uses and the knowledge she has gained at the VA do not transfer well to other positions. She did not apply for any jobs outside of the VA because she was not aware of any positions that she would be qualified for that would have a similar salary.

She testified that prior to the parties' separation, it was her intention to stay in Syracuse, Nebraska, until the children finished school. However, for reasons that will be discussed in further detail in our analysis, she felt her reputation had been damaged because Corey had caused her personal life to become an issue at work. She believed this called her integrity into question, which, in turn, adversely affected her ability to do her job.

Angela accepted a position at the VA in Washington, D.C., on August 29, 2014, which is at the same pay grade as her position in Lincoln, so it is considered a lateral move. She testified that the position in Washington, D.C., paid $101,000, compared to the $93,000 she earned in Lincoln, and that some of the difference in pay is attributable to cost of living expenses. She testified that the position she vacated in Lincoln had been filled by another person and would no longer be available to her. She was aware of only three positions in Lincoln that she could be potentially promoted to, and none were likely to be vacant in the near future. She testified that there is enhanced opportunity for advancement in the Washington, D.C., office and that the next promotion would include a base salary of $108,000.

Angela testified that she had secured a residence in a townhouse in Virginia. She testified that the townhouse is near the school the children would attend and had square footage

similar to that of the marital home. The townhouse has three bedrooms, 3½ bathrooms, a yard, and a basement which would allow Moritz to live with them. Angela testified that she had not yet signed the lease, but she intended to sign it on the day of trial.

Moritz testified that she lived with the parties for about a year shortly after the children were born and continued to be present in the home throughout their lives. She said she observed Angela maintaining the children's schedules, helping with homework, and seeing to their daily needs. She said she did not observe Corey helping with schedules or homework and described him as a "slob" who lacked organizational skills. Moritz testified that if Angela were given permission to remove the children, she would move with them to Virginia and would help with transportation and general care of the children. If Angela were not given permission to remove the children, Moritz did not intend to stay in Syracuse. She stated she would not stay because she believed Corey "would never let [her] see the children, and if [she] did get to see the children, [Corey] would want [her] to raise them from sunup to sundown." She testified that Corey lacked some parenting skills. She said, "He can't talk to the girls about certain things without getting angry with them," and stated her belief that he was "always barking orders" instead of trying to reason with them.

Corey testified that he is employed by the Nebraska Army National Guard as an "Initial Active Duty Training Manager." His work location is Camp Ashland, which is located 38 miles from Syracuse. At the time of trial, he had been a full-time employee of the National Guard for 16 years and his rank was "Sergeant First Class." As part of the National Guard, he was deployed twice, once in 2003 to Fort Riley, Kansas, for 67 days and once in 2010-11 to Afghanistan for a period of 10½ months.

He testified that his average workday is from 7:30 a.m. to 4 p.m. and that he has one "drill weekend" per month. He

testified that he had at least 4 more years before he was eligible to retire and that he had not decided whether he would retire at that time. He investigated transferring his job to a guard in the Washington, D.C., area, but because he was nearing 17 years of active service, he was unsure whether he would be able to secure a position. If he were to transfer, he would need to go through an application process, and a position in his job skill would need to be available. Corey testified that he liked his job and his position at Camp Ashland.

Corey testified that he attends the majority of the children's extracurricular events, attends the majority of parent-teacher conferences at school, helps with transportation to medical appointments, and has coached a few of the children's softball and soccer teams. He testified that he enjoys spending leisure time with the children, including hunting, rafting, attending football games, fishing, and riding four-wheelers.

Corey testified that he has a support network in Syracuse, including his mother, church members, and several family friends upon whom he could rely if he needed help, or if there was an emergency. He testified that at the time, he was living with his mother, but that he planned to purchase a new home in Syracuse after the divorce.

Corey and Angela both testified that they believed their daughters exercise "good judgment for their age" or are "fairly responsible for their age," and both said they believed the children's wishes should be considered by the trial court.

Brooke and Hannah testified that there are activities they enjoy doing with both parents, but both stated that Angela helped more with the day-to-day parenting functions and that they felt more comfortable talking with her about personal issues, including boyfriends, makeup, puberty, and shopping for undergarments. They testified that they would miss their friends and Corey in Syracuse, but that they would prefer to move to Sterling and to live with Angela. Hannah testified that she had a closer emotional bond with Angela and felt more comfortable talking with her about problems. She

expressed concerns about Corey's ability to take care of daily tasks, such as laundry, and said Angela cooks healthier, does her laundry, and helps with homework. Brooke testified that Angela listens to her, helps make her day better, and "takes better care of us."

Both Brooke and Hannah expressed concerns about how Corey handles stressful situations, including yelling and breaking things. They testified that when they told Corey they would prefer to live with Angela, he refused to speak with them for the rest of the night, and Hannah testified that the next morning he said, "'I guess I'm not part of your life anymore.'" Brooke testified that on occasion, Corey says things that make her feel bad about herself. They also expressed a belief that if they lived with Corey in Syracuse, they would not be able to see Angela very often.

The district court's order sets out a detailed discussion of the various elements used to determine the custodial issues based on the best interests of the minor children before analyzing the elements used for removal. The court noted that according to Angela, she has been the primary caregiver and has tended to the children's needs, including cooking, laundering clothes, cleaning the home, scheduling, transporting the children to activities and medical appointments, helping with homework, and planning for birthdays and holidays. Angela still performed these duties and prepared schedules and meals ahead of any travel so the children were prepared for school and extracurricular activities and had healthy meals to eat in her absence. The court also noted that the children are age 13 and that Angela suggested the children would need her assistance in dealing with puberty, issues related to their health, and making right choices. Corey testified that he has been active in the children's lives and cared for the children independently while Angela traveled for work and during the parties' rotating parenting time schedule after their separation.

The court also considered testimony regarding Corey's poor housekeeping skills, Angela's alleged extramarital

relationships, and the interaction and assistance the maternal and paternal grandmothers have with and provide to the family. The court found the evidence indicated that both parties were fit and proper parents who have been active in the children's lives and that the children's needs are being met. The court considered the testimony of both children, because they were of sufficient age and maturity to understand the need to tell the truth and were able to articulate their desires based on sound reasoning. The children testified that their preference would be to reside with Angela.

Based on the totality of the facts presented, the court found it was in the best interests of the minor children that their physical custody be placed with Angela, subject to rights of reasonable visitation with Corey.

In reaching a determination on the issue of removal, the court presumed that it was not required to consider the factors ordinarily considered in removal cases, as there was no permanent custody order previously entered. However, the court still discussed and considered each of the factors traditionally used to determine whether removal is appropriate, and it granted Angela's request for removal.

Corey timely appealed.

### III. ASSIGNMENTS OF ERROR

Corey asserts the district court erred by finding that Angela had a legitimate reason to move and by finding that it is in the children's best interests to remove the children from Nebraska.

### IV. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

[2] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters entrusted for disposition through a judicial system. *Geiss v. Geiss*, 20 Neb. App. 861, 835 N.W.2d 774 (2013).

[3] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013).

## V. ANALYSIS

In this case, Angela requested permission to remove the children from Nebraska as part of the original complaint for dissolution of her marriage to Corey.

The district court considered the totality of the facts presented and found that it was in the best interests of the parties' minor children to place physical custody with Angela, subject to rights of reasonable visitation with Corey. The court found that Angela was the parent who provided the children with the daily care they required and that they were more bonded with her. Then the court considered the issue of removal of the children from the State of Nebraska, before ultimately concluding that Angela had met her burden of showing that it is in the children's best interests to relocate to the State of Virginia, and the court authorized her to relocate with the children.

On appeal, Corey asserts only that the district court erred by finding that Angela had a legitimate reason to move and by finding that it was in the children's best interests to remove the children from Nebraska. He does not argue that the trial court's determination of custody was in error. Therefore, we need not address the trial court's decision to place physical custody with Angela, and we will address only the issue of removal.

[4] There is a two-step process before a custodial parent is allowed to remove a child from the State of Nebraska. The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

In this case, the district court determined that the factors considered in *Farnsworth, supra*, and later in *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002), "presumably" do not apply where a permanent custody order had not been previously entered. Nonetheless, the district court set forth the factors considered when determining whether removal is appropriate and determined that they were relevant to the present case; therefore, they would be considered by the court. Ultimately, the district court determined that Angela had shown a legitimate reason for leaving the State of Nebraska and that the move was in the children's best interests.

[5] Removal jurisprudence has been applied most frequently when a custodial parent requests permission to remove a child from the state and custody has already been established. However, the Nebraska Supreme Court has used the factors considered in *Farnsworth* when determining whether removal is appropriate in an initial custody determination. See *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). In December 2014, this court considered whether removal jurisprudence applied to a situation where the mother removed the child from the State of Nebraska prior to filing for dissolution or a request for removal; thus, there was no prior custody determination. See *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014). In *Rommers*, the district court dissolved the parties' marriage and found that because there was no prior custody determination, the court was not required to engage in a removal analysis, although the court still considered the relevant factors in determining custody based upon the child's best interests. On appeal, we found that the trial court should have made a

determination of custody first, then conducted a proper *Farnsworth* removal analysis.

Although the district court's presumption that *Farnsworth* did not apply in this case was in error, see *Kalkowski, supra*, and *Rommers, supra*, it still engaged in a thorough analysis of the *Farnsworth* factors before reaching its ultimate conclusion authorizing removal. In an action for the dissolution of marriage, we review the record de novo on appeal. See *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

## 1. Legitimate Reason to Relocate

[6] To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

Corey asserts that the district court erroneously relied on this court's decision in *Schrag v. Spear*, 22 Neb. App. 139, 849 N.W.2d 551 (2014), which was subsequently reversed by the Nebraska Supreme Court in *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The district court's order herein was entered prior to the release of the Supreme Court's decision in that case; however, the district court's reference to the Court of Appeals' underlying decision was solely to provide one example of a factual basis supporting a legitimate reason for removal. The Supreme Court's subsequent determinations that the mother had ulterior motives for the move and that the decision to move was made with no firm or likely prospects for career enhancement had no bearing on the instant matter, because the facts are distinguishable. See *id.* In this case, Angela was offered, and accepted, a new position in the Washington, D.C., division of the VA. Although the position was considered a lateral move, it included an increased salary and presented a greater likelihood of advancement within the VA than the position in Lincoln did.

Corey also asserts Angela had ulterior motives in deciding to move, namely his belief that Angela's desire to move is not

work related, but, rather, to be closer to a male friend. Although there is evidence that Angela began a relationship with that friend shortly after the parties separated, there is also evidence that the relationship was not romantically serious at the time and was not the motivating factor for her decision to relocate. Angela testified that she does not "love" the friend and that although she enjoys spending time with him, she is not ready to make a commitment or introduce him to her daughters. When Angela was asked whether his presence nearby had "anything to do with the move to [Washington,] D.C.," she replied, "No." The friend stated in his deposition that he cares for Angela and loves her as a friend, but that they have no definite plans for a serious romantic relationship.

In addition to the potential for advancement opportunities in Washington, D.C., Angela testified that she felt it was necessary for her to leave the Lincoln VA offices because her professional reputation was damaged by Corey's interference with her work and by speculation regarding her personal life. Corey also believed that Angela was having an affair with a male coworker in Lincoln. Corey confronted the coworker about the alleged affair and spoke numerous times with the coworker's wife about the issue. The male coworker and Angela both denied any affair, and there is no evidence to substantiate this allegation. However, Angela testified that she overheard other coworkers discussing the alleged affair at work and that she felt it adversely affected her ability to do her job. She testified that her position at the VA requires a high level of integrity, and she felt it was impugned by these rumors.

Angela also testified that after she was denied the opportunity to participate in a special work project, Corey went to see Angela's supervisor at her home after work hours. The supervisor testified that she did not feel frightened by the visit, but that she did ask her husband to join her and Corey for the conversation. She testified that Corey's visit did not impact her opinion of Angela. Nonetheless, Angela testified that she

no longer felt that she could perform her duties in the Lincoln office because she had intentionally kept her personal life separate from her employment and these incidents adversely affected her professional role. One of Angela's coworkers testified that she observed a change in Angela's demeanor at work, in that she was more emotional, was less confident, and no longer assumed leadership roles in meetings.

In reaching the conclusion that Angela had a legitimate reason to relocate, the court expressed concern about the "timing of the employment decision and the commencement of [Angela's] relationship" with the aforementioned male friend, but found that relationship was not the main reason for Angela's decision to relocate. The court found the evidence showed that Angela had additional opportunities for advancement of her career which were not available in Lincoln and that Corey's actions related to Angela's workplace created a "charged environment" which adversely affected her ability to do her job.

[7] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013). Upon our review of the evidence, we find the trial court did not err in finding Angela's new position and potential for career advancement, and her desire to obtain and maintain a professional work environment, were legitimate reasons to relocate.

## 2. Best Interests

Corey asserts that if the second step of the analysis in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), is applied, the court would find that it is not in the children's best interests to leave the State of Nebraska. Specifically, he asserts the move would be detrimental to his relationship with the children and would have a negative effect on their emotional, physical, and developmental needs.

The record shows that the court engaged in a detailed analysis of the *Farnsworth* factors and found that it was in the children's best interests to allow them to move to Virginia with Angela.

[8] In determining whether removal to another jurisdiction is in the children's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move, (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent, and (3) the impact such a move will have on contact between the children and the noncustodial parent. See *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014).

### (a) Each Parent's Motives

[9] The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted removal in an effort to frustrate or manipulate the other party. *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013), citing *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007).

The court determined that Angela's motive for the move appeared to be based on her desire to end her marriage, her desire to advance her employment opportunities, her limited contacts within the State of Nebraska, and her desire to further her relationship with a male friend. The court found that none of the motives appeared to be centered upon denying Corey the opportunity to have a relationship with Brooke and Hannah. The court found Corey's motive for opposing the move was based upon his genuine desire to maintain a strong relationship with the children. The court noted that it did not appear that Corey wanted the divorce to occur, but his opposition to the move did not seem to be based upon animosity toward or manipulation of Angela.

The evidence supports the court's analysis of the situation, and we do not find either party acted in bad faith. Thus, this factor does not weigh for or against removal.

### (b) Quality of Life

[10] In determining the potential that removal to another jurisdiction holds for enhancing the quality of life of the children and the custodial parent, a court should evaluate the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the parties; and (9) the living conditions and employment opportunities for the custodial parent. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999).

### (i) Emotional, Physical, and Developmental Needs

We first consider the impact on the children's emotional, physical, and developmental needs in assessing the extent to which the move could enhance their lives.

The district court found that the evidence did not show the move would improve these areas of the children's lives, but that requiring the children to remain in Nebraska with Corey would be detrimental to their emotional and developmental needs because they are not as emotionally bonded to him as they are to Angela. The court considered the children's testimony that they prefer to talk about personal issues with Angela. The court also noted that Corey did not handle emotionally charged situations very well; when he was told that the children wanted to move, he initially refused to speak with them and the next morning told them: "'I guess I'm not part of your life anymore.'"

Upon our de novo review, we find the evidence shows Angela was the children's primary caregiver from birth, and

even when the children were not in Angela's physical presence, she made every effort to ensure their needs were tended to. She was responsible for the children's daily needs, including preparation of food, laundry, school supplies, taking them to appointments and activities, helping with homework, and helping them through their personal issues. The evidence shows Corey is capable of caring for the children, but that his interactions with them were more limited to leisure activities. Although it appears the emotional, physical, and developmental needs may be met at a baseline level with either parent, the evidence indicates Angela is able to meet these needs more effectively. This factor weighs in favor of removal.

### (ii) Children's Opinion
### or Preference

The children each stated that they preferred to move with Angela. Their testimony focused on their emotional bond with Angela and Moritz, their maternal grandmother, who testified that she planned to move with them if Angela were given permission to remove the children from Nebraska.

The record indicates that the children are old enough to evaluate the benefits of living in Nebraska versus Virginia. In their testimony, they articulated the reasons for their decision, including the level of care they receive in Angela's home and the bond that they share with her. They testified that they would miss Corey and the fun things they do together, but they stated their preference to live with Angela in Virginia. The parties agree that this factor weighs in favor of removal.

### (iii) Enhancement of Relocating Parent's
### Income or Employment

As previously discussed, the evidence shows Angela's relocation to Virginia includes a nominal increase in income, but will offer greater opportunities for advancement and additional income within her field. The evidence shows Angela's expertise in her position at the VA is best suited for advancement within the VA system, and there are limited opportunities for

advancement in the Lincoln office. This factor weighs slightly in favor of removal.

### (iv) Degree to Which Housing or
### Living Conditions Would
### Be Improved

At the time of trial, both parties were residing with their mothers, as the marital home had been recently sold. The parties also owned a smaller home which was being rented by Angela's mother, Moritz. Moritz testified that she did not plan to stay in Syracuse after the parties divorced. Corey testified that he would move into the smaller home until he could find another home in Syracuse. The district court noted the evidence indicated that the smaller home in Syracuse would not be suitable as a long-term residence for Corey if the children were to live with him full time.

Angela testified that she had secured a residence in a townhouse in Virginia. She testified that the townhouse is near the school the children would attend and had square footage similar to that of the marital home. The townhouse has three bedrooms, 3½ bathrooms, a yard, and a basement which would allow Moritz to live with them. Angela testified that she had not yet signed the lease, but she intended to sign it on the day of trial.

In previous cases, where the evidence does not establish any significant improvement in housing or living conditions, we have determined that the factor does not weigh in favor of or against removal. See *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013), citing *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). The townhouse Angela planned to lease is potentially more suitable than the smaller home Corey would reside in. However, because Angela had not yet committed to the lease and Corey stated his intention to find a more suitable home in Syracuse, the housing conditions are relatively fluid and this factor does not weigh in favor of or against removal.

#### (v) Existence of Educational Advantages

Another factor to consider is whether the school in Virginia offers educational advantages. The evidence shows the school the children would attend was held out as an "up-and-coming" school in the state and was labeled by the "Virginia Middle School Association" as a "school to watch." The middle school and high school the children would attend in Virginia were ranked highly within the state and were recognized nationally. The schools in Syracuse were recently renovated and offered an excellent education. The children were doing well in school, and neither had special needs. Angela testified that she believed the schools in Syracuse and in Virginia were good schools and that she did not believe one was better than the other. It appears that schools in both locations are capable of serving the children's educational needs and that neither school has an advantage over the other. We find this factor does not weigh in favor of or against removal.

#### (vi) Quality of Relationship Between Children and Each Parent

The district court stated the move to Virginia would significantly reduce Corey's parenting time and negatively impact the children's relationship with him, as their school and extracurricular activities would be at a greater distance from his home. The district court also noted that the children have a stronger bond with Angela, as indicated by their desire to reside with her. The district court did not make a specific finding with regard to whether this factor weighed in favor of removal.

At trial, the children testified that they share a good relationship with both Corey and Angela. The children have certain activities that they enjoy doing with each parent, and both parents attend the majority of the children's parent-teacher conferences and extracurricular events.

A psychologist who did not work directly with either party testified that time and distance impact children's relationship

with their parents. She opined that a distance over 75 miles affects the relationship, because it is more difficult for them and their parents to see each other on a regular basis. She further testified that a weakened paternal relationship leads to risk factors, including drugs and alcohol, premarital sex, early pregnancy, and dropping out of school. Corey asserts that if the children were to move, it would weaken their relationship with him, and he implies that the children will be at a greater risk for the negative outcomes the psychologist discussed. Thus, he asserts, "it is in the children's best interests to maintain the bond with [Corey]." Brief for appellant at 28.

There is no question that it is in the children's best interests to maintain a bond with Corey, but that is not the question we are asked to consider. Rather, we must determine the impact on the quality of the relationship between the children and each parent. The evidence shows the children have a good relationship with both parents. The children enjoy golfing and hunting with Corey and shopping, getting their nails done, and playing games with Angela. Both parents have unique and beneficial relationships with the children, and it appears that both parties are willing to cooperate to ensure that those relationships are maintained. However, the children testified that Angela listens better to their problems, they believed their relationship with her would suffer if they were not allowed to move, and both stated their desire to reside with her. One child also testified that she believed Angela would be more proactive than Corey in ensuring that the children would have more frequent opportunities to see the noncustodial parent.

Angela testified that she would be willing to videotape the children's extracurricular activities so Corey would be able to see them, would keep him informed regarding the children's academic performance, and would help them to have regular telephone or "Skype" contact with Corey. She testified that she would make sure that Corey was able to maintain his relationship with the children if they were allowed to move with her.

We find that the children's strong bond with Angela, coupled with Angela's willingness to help the children maintain a strong bond with Corey, weighs in favor of allowing removal.

### (vii) Strength of Children's Ties to Present Community and Extended Family

The district court considered the evidence that the children appeared to have strong ties to the Syracuse community through their school, extracurricular activities, and friends. They testified that they enjoy their school and activities, but believed that they would be able to participate in similar activities in Virginia and that they would be able to make new friends in their new school. The court noted that Corey did not work in Syracuse, but, rather, worked in Ashland, Nebraska, and that with the exception of the children's grandmothers, neither party had extended family in Nebraska. One grandmother, Moritz, testified that she intended to move from Syracuse after the divorce was final, no matter what finding the court made with regard to removal. Moritz said that if the children were to move to Virginia, she would move there too, and that if they did not, she would move to Colorado.

The evidence shows that the children do not have significant extended family in either Syracuse or Virginia and that no matter where they live, they would have one parent and at least one grandparent nearby. However, the children have lived in Syracuse for their entire lives, so their ties to their community through school, church, and extracurricular activities are strong, and although they are willing to create those types of community relationships in Virginia, they did not exist in Virginia at the time of trial. This factor weighs slightly against removal.

### (viii) Likelihood That Allowing or Denying Move Would Antagonize Hostilities Between Parties

The court found that any relocation would likely antagonize hostilities between the parties. The court noted that the

parties appeared to be communicating well and cooperating with each other to meet the children's needs. However, if the children were to move, the court found, it was obvious that Corey would be "emotionally harmed and that [the] strain may antagonize the parties' relationship."

We find that either granting or denying removal has the potential to antagonize hostilities between the parties, so we do not find this factor weighs in favor of or against removal. See *Dragon v. Dragon*, 21 Neb. App. 228, 838 N.W.2d 56 (2013).

### (ix) Well-Being of Custodial Parent

The final "quality of life" factor listed in *Farnsworth v. Farnsworth*, 257 Neb. 242, 250, 251, 597 N.W.2d 592, 598, 599 (1999), is consideration of the "living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent." A comparison of the physical residences is considered under a separate factor, as is the custodial parent's income or employment enhancements; therefore, we view this factor to focus more on how the proposed new living conditions and employment impact the well-being of the custodial parent.

We have already established that the move to Virginia allows Angela the opportunity for advancement of her career and a "fresh start" at her place of employment. Additionally, at the time of trial, Angela resided with Moritz because the family home had been sold. In Virginia, Angela planned to move into a townhouse with three bedrooms, a yard, and ample space for the children and Moritz to live with her. Angela expressed her desire to move for personal and professional reasons. We find the move to Virginia has the potential to enhance Angela's well-being, and we find this factor weighs in favor of removal.

### (x) Conclusion Regarding
### Quality of Life

After considering all of the quality-of-life factors, we conclude upon our de novo review that Angela established

removal would enhance the quality of life for the children and for herself.

### (c) Impact on Noncustodial
### Parent's Visitation

Relocating to Virginia will undoubtedly have an effect on the time Brooke and Hannah spend with Corey. Corey would not have the opportunity to exercise weekly parenting time, and it would undoubtedly affect his relationship with the children. Angela recognized the impact this change would have, and she stated that she believed Corey should have as much parenting time with the children as reasonably possible. She proposed a visitation schedule which would be used no matter what the court determined with regard to removal. The proposed plan allowed the noncustodial parent to take advantage of long weekends and breaks in the children's school schedule. The plan set forth a proposal for the parents to share time on the major holidays and allow the noncustodial parent to have the children for an extended period during the summer breaks. She testified that parenting time was a high priority and proposed offsetting child support costs to pay for transportation. Angela testified that she was willing to fly or drive with the children for visitation with Corey and that she had researched programs to allow the children to fly as unaccompanied minors to and from Nebraska.

The district court considered the impact the move would have on Corey's relationship with the children and ultimately concluded that Angela's role as the day-to-day caregiver was more important than Corey's role as "the 'fun' parent." The court found that the extended parenting time during summer and school breaks would allow the children to participate in the activities they enjoy sharing with Corey.

[11] Nebraska courts have recognized that a noncustodial parent's visitation rights are important, but a reduction in visitation time does not necessarily preclude a custodial parent from relocating for a legitimate reason. See *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986). Rather, we focus on

the ability of the noncustodial parent to maintain a meaningful parent-child relationship, and such relationship is possible even if Brooke and Hannah move to Virginia. See *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). This factor weighs slightly against removal, because it will reduce the amount of in-person weekly contact the children have with Corey, but removal would still allow them to maintain a meaningful relationship.

### (d) Conclusion on Best Interests

A de novo review of the evidence shows that the parents were not motivated by an effort on the part of either parent to frustrate the relationship of their children with the other and that the move would enhance the children's quality of life. Though the move has the potential to impact the relationship between Corey and the children, we find they will still be able to see one another frequently and continue sharing in the activities they enjoy; thus, Corey and the children will be able to maintain a meaningful relationship despite the distance. The record demonstrates sufficient evidence that it is in Brooke's and Hannah's best interests to move from Nebraska to Virginia.

## VI. CONCLUSION

Upon our de novo review, we find the district court did not err in finding that Angela had a legitimate reason to remove the children from the State of Nebraska and that the move was in the children's best interests.

Affirmed.